# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 97-CA-00550-SCT

*LAURA GIPSON KILPATRICK*

*v.*

*JOHNNIE MAX KILPATRICK*

| | |
|---|---|
| DATE OF JUDGMENT: | 03/27/97 |
| TRIAL JUDGE: | HON. KENNETH BARKLEY ROBERTSON |
| COURT FROM WHICH APPEALED: | NESHOBA COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | LAWRENCE PRIMEAUX |
| ATTORNEYS FOR APPELLEE: | DANIEL P. SELF, JR. |
| | DONALD J. KILGORE |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND REMANDED IN PART - 1/14/99 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 2/23/99 |

**BEFORE PRATHER, C.J., BANKS AND WALLER, JJ.**

**WALLER, JUSTICE, FOR THE COURT:**

## SUMMARY

¶1. Appellant, Laura Gipson Kilpatrick ("Laura"), filed a Complaint for Divorce against her husband Appellee, Johnnie Max Kilpatrick ("Max"), in the Chancery Court of Neshoba County Mississippi, on October 5, 1993. Laura filed an Amended Complaint for Divorce on September 30, 1994. On February 13, 1997, Special Chancellor Kenneth B. Robertson rendered a decision granting Max and Laura a divorce on the ground of irreconcilable differences.

¶2. Aggrieved by the Special Chancellor's decision, Laura appealed assigning two errors:

> **I. WHETHER CHANCELLOR WAS MANIFESTLY IN ERROR IN DENYING LAURA KILPATRICK AN AWARD OF PERIODIC ALIMONY, SO THAT HIS DECISION SHOULD BE REVERSED.**
>
> **II. WHETHER THE CHANCELLOR WAS MANIFESTLY IN ERROR AND APPLIED AN ERRONEOUS LEGAL STANDARD IN THE DIVISION OF MARITAL PROPERTY**

**AND AWARD OF LUMP SUM ALIMONY SO THAT HIS DECISION SHOULD BE REVERSED.**

## PROCEDURAL HISTORY

¶3. Because Max is a practicing attorney in the district, both sitting chancellors in the Sixth Chancery Court District recused themselves by an Order dated December 20, 1994. This Court appointed Kenneth B. Robertson of Pascagoula as a Special Chancellor on March 2, 1995. On October 2, 1995, Max and Laura entered into a Consent to Divorce on the Ground of Irreconcilable Differences listing eighteen contested issues summarized below.

1. Who should have use, ownership and possession of the former marital residence and adjoining lot and who should pay expenses associated with the home;

2. The form, amount, duration and manner of alimony, if any;

3. Who should have use, ownership, and possession of a 1991 Lincoln Town car, who should pay the debt and operating expenses on the car and whether Max should furnish Laura with a replacement vehicle of comparable value;

4. Who should have use, ownership and possession of Cabin #178, titled in Max's name, at the Neshoba County Fairgrounds;

5. Whether Max should pay the joint debts of Max and Laura;

6. Equitable division of the real property and financial assets of Max and Laura and whether the equitable distribution theory of law adopted by the Mississippi Supreme Court is unconstitutional under the Constitutions of the United States and the State of Mississippi;

7. Whether Max should pay Laura a reasonable attorney's fee and all costs of court;

8. Whether Max should have a credit against any equitable division for (1) the college expenses paid for Max's and Laura's children and (2) additional tax liability for Laura's refusal to file a joint tax return;

9. Whether any proceeds derived from fees earned by Max in the case of *Jackson v. General Motors* should be subject to equitable division and whether any expenses or after-raised claims of that case or claims from the Estate of Cliff Finch should be charged to any share awarded to Laura;

¶4. Laura and Max appeared for trial on November 20, 1995 and December 19 and 20, 1995.

¶5. After taking the matter under advisement[1], on February 13, 1997, Special Chancellor Robertson rendered a decision granting Max and Laura a divorce on the ground of irreconcilable differences and approving Max's and Laura's agreement in which Max assumed responsibility for their son's college education expenses. Special Chancellor Robertson, addressing the contested issues, then issued findings summarized below.

1. Equitable distribution is not unconstitutional.

2. Laura was granted title and ownership of the marital home and adjoining residential lot and all contents of the home. Max was to pay all mortgage payments due on the home. Max was also to pay all ad valorem taxes and insurance on the home through 2000. Laura was responsible for all other costs associated with the home.

3. Laura was granted title to the 1991 Lincoln Town car free and clear of all debts.

4. Laura was granted her IRA accounts, her state retirement account and her life insurance policies free and clear of any claim by Max.

5. Max was to pay Laura the lump sum of $20,000 plus the sum of $5,000 per year for three years, beginning in January, 1998. Max was to also contribute $5,500 toward Laura's attorney's fees and pay all costs of court.

6. The remainder of the property in dispute, including the law office building and equipment, furniture and fixtures; the Fair Cabin #178; the house at Route 6, Box 27-B, Philadelphia; the farm equipment and stock in Kilpatrick Farms, Inc.; Max's military and state retirement; and the business and personal checking and savings accounts was granted to Max and he was to hold Laura harmless from any debt owing thereon.

## FACTS OF THE CASE

¶6. Max and Laura were married to each other on August 5, 1966 and they were divorced from each other the first time on May 20, 1972 in Neshoba County Chancery Court. The chancery court set aside the divorce decree and reinstated their marriage on March 20, 1974, after Max and Laura filed a joint petition for reinstatement. They lived together from that date until September 1, 1993, when they separated permanently and finally. Max and Laura had three children during their marriage, all of whom were emancipated by the time the trial concluded.

¶7. At the time of their first marriage, Laura was in her final year of college at Mississippi College for Women. Laura completed her practice teaching and received a B.S. degree in speech pathology and speech therapy. Max graduated from Mississippi State University with a degree in accounting the next year. During the early years of their marriage, Max and Laura lived in several cites, Columbus, Clinton, Birmingham, and Corinth, where Max worked as an accountant and Laura worked as a speech pathologist. Their first child was also born during these early years.

¶8. In 1970 the family moved to Oxford so Max could attend law school at the University of Mississippi. Laura worked as a speech pathologist in the Oxford schools to support the family. Max contributed to the family income with his salary from a part time job in the library. During this period, their second child was born.

¶9. In the fall of 1971, Max was elected to the Mississippi State Legislature. Laura helped with the campaign by distributing materials, soliciting votes and doing other things necessary for the campaign. In November 1971, Max encouraged Laura to leave her job in Oxford and move with their children to Philadelphia where she took a job at the Choctaw Indian Reservation and used her income to support the household. During this period of separation, Max's and Laura's first divorce was granted.

¶10. Max began practicing law in Philadelphia in 1974. After Max opened his law office, Max and Laura

reconciled and had the original divorce judgment set aside. Shortly after this time, their third child was born. Max and Laura lived together from that time until their separation, September 1, 1993.

¶11. Since approximately 1975, Laura has worked for the Neshoba County School System as a speech pathologist. During her employment with the school system, Laura participated in the Public Employees' Retirement System of Mississippi (PERS). Laura valued her PERS account at its cash surrender value of $33,416.

¶12. In 1989, Max became involved in a personal injury case, styled *Jackson v. General Motors*. He worked on this case until 1994 when he received his share of the proceeds. Max's gross income from this case was $1,271,725. In addition to expenses associated with the case, Max listed various claims on the total settlement amount, including pending lawsuits brought by other attorneys involved in the case and the circuit clerk of Lafayette County. For 1994 Max listed his net income from his law practice as $848,039. This amount included his net income from the *Jackson v. General Motors* case and approximately $157,000 in other income from his law practice that year.

## DISCUSSION OF LAW

**I. WHETHER CHANCELLOR WAS MANIFESTLY IN ERROR IN DENYING LAURA KILPATRICK AN AWARD OF PERIODIC ALIMONY, SO THAT HIS DECISION SHOULD BE REVERSED.**

**II. WHETHER THE CHANCELLOR WAS MANIFESTLY IN ERROR AND APPLIED AN ERRONEOUS LEGAL STANDARD IN THE DIVISION OF MARITAL PROPERTY AND AWARD OF LUMP SUM ALIMONY SO THAT HIS DECISION SHOULD BE REVERSED.**

## STANDARD OF REVIEW

¶13. "This Court will not disturb the findings of a chancellor when supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong, clearly erroneous or an erroneous legal standard was applied." *Herring Gas Co. v. Whiddon*, 616 So. 2d 892, 894 (Miss. 1993). "`Under the standard of review utilized to review a chancery court's findings of fact, particularly in the areas of divorce, alimony and child support, this Court will not overturn the court on appeal unless its findings were manifestly wrong.'" *Mizell v. Mizell*, 708 So. 2d 55, 64 (Miss. 1998) (quoting *Tilley v. Tilley*, 610 So. 2d 348, 351 (Miss. 1992)).

## EQUITABLE DISTRIBUTION

¶14. After reviewing the evidence presented, Special Chancellor Robertson divided the couple's property as outlined above. Special Chancellor Robertson also awarded Laura lump sum alimony totaling $35,000 with an initial payment of $20,000 plus $5,000 a year for three years beginning January, 1998.

¶15. In *Ferguson v. Ferguson*, we directed the chancery courts to evaluate the division of marital assets by following a nonexclusive list of eight guidelines and *"to support their decisions with findings of fact and conclusions of law for purposes of appellate review*."*Ferguson v. Ferguson*, 639 So. 2d 921, 928 (Miss. 1994) (emphasis added). In the present case, there are no specific findings in the record to

show Special Chancellor Robertson considered the *Ferguson* guidelines and applied those guidelines to the evidence.

¶16. In *Johnson v. Johnson*, we outlined the steps involved in the process of applying the equitable distribution factors listed in *Ferguson*. *Johnson v. Johnson*, 650 So. 2d 1281, 1287 (Miss. 1994). First, the chancellor is to classify the parties' assets as marital or non-marital based on our decision in *Hemsley v. Hemsley*, 639 So. 2d 909 (Miss. 1994). Second, the chancellor is to value and equitably divide the marital property employing the *Ferguson* factors as guidelines, in light of each party's non-marital property. *Johnson*, 650 So. 2d at 1287. Third, if the marital assets, after equitable division and in light of the parties' non-marital assets, will adequately provide for both parties, then "no more need be done." *Id*. Finally, if an equitable division of marital property, considered with each party's non-marital assets, leaves a deficit for one party, then alimony should be considered. *Id*.

¶17. Max argues in his brief"[i]t is obvious that the Chancellor considered the *Ferguson* guidelines in his award. . . ." As evidence to support this argument, Max cites one of the chancellor's findings.

> The Court is aware of the Defendants [sic] argument that this ruling or finding will place the value of the Plaintiffs [sic] unincumbered [sic] assets at a value greater than his, however the Court finds the same is just and reasonable.

Laura argues in her brief, despite abundant evidence in the record upon which the Special Chancellor could have based a *Ferguson* analysis, the record does not reflect that he did so. She urges this Court to render a judgment "adjusting the equities to effect an equitable result."

¶18. Assuming all of Max's and Laura's property is marital property,[2] below is a list of the values of the property awarded to Max and Laura with debt owed thereon taken into account.

## LAURA'S PROPERTY Net Asset Value

Marital home & adjoining lot 114,000 debt paid before divorce

Contents of Home 5,600

Lincoln Town Car 15,150 debt paid before divorce

Laura's IRA 14,655

Laura's PERS Account 33,416

Laura's Life Insurance 4,721


Total net value $187,542


## MAX'S PROPERTY

A. Law Office

Office Building 18,866 75,000 - 56,134 debt

Office Furniture & Equipment 19,500

B. Farm, Farm Stock, Equipment [3]

Cash 1,170

Cabin (18,000) 62,000 - 80,000 note - cabin & land

44 acres @$300 13,200

172 acres @ $450 77,400

Equipment equity 1,334 3,000 - 2,666 note on bush hog

Cows (15,000) 13,000 - 28,000 note on cows

C. Other Real Property & Furnishing

House at Rt. 6 B 25,148 96,000 - 70,852 debt

Furnishings for Rt. 6 B 9,000

Condominium & Furnishings 8,943 33,000 - 26,000 debt +1,943

Fair Cabin & Furnishings 11,527 30,000 - 18,473 debt

D. Other

Max's Retirement 7,277

Automobiles 28,600

Total net value $188,965

¶19. What is absent from the Special Chancellor's findings is any consideration of the $848,039 in net income reported by Max for tax year 1994. Without findings from the Chancellor concerning this income or use of income, we cannot determine if the distribution of property outlined above meets the standards of equitable distribution required by *Ferguson*. On remand the Chancellor is to make specific findings as to what happened to the 1994 income and then to review the distribution of property in light of those findings. There may well be a reasonable explanation, but from the record all of this income was not used to retire debt on marital property or pay income taxes.

## ALIMONY

¶20. After an equitable division of martial property, the final step the chancellor must complete is a consideration of the need, if any, for alimony. *Johnson*, 650 So. 2d at 1287. In awarding alimony, the chancellor is to consider the twelve factors listed in *Armstrong v. Armstrong*, 618 So. 2d 1278, 1280 (Miss. 1993):

1. The income and expenses of the parties;

2. The health and earning capacities of the parties;

3. The needs of each party;

4. The obligations and assets of each party;

5. The length of the marriage;

6. The presence or absence of minor children in the home, which may require that one or both of the parties either pay, or personally provide, child care;

7. The age of the parties;

8. The standard of living of the parties, both during the marriage and at the time of the support determination;

9. The tax consequences of the spousal support order;

10. Fault or misconduct;

11. Wasteful dissipation of assets by either party; or

12. Any other factor deemed by the court to be "just and equitable" in connection with the setting of spousal support.

*Armstrong*, 618 So. 2d at 1280.

¶21. Laura argues the Special Chancellor erred by not awarding her periodic alimony. A wife is generally entitled to periodic alimony when her income is inadequate to allow her to maintain her standard of living and when her husband is able to pay. *Heigle v. Heigle*, 654 So. 2d 895, 898 (Miss. 1995). The factors a chancellor should consider when determining the appropriate amount of alimony include "`not only the reasonable needs of the wife but also the right of the husband `to lead as normal a life as reasonably possible with a decent standard of living"." *Massey v. Massey*, 475 So. 2d 802, 803 (Miss. 1985) (quoting *Hopton v. Hopton*, 342 So. 2d 1298, 1300 (Miss.1977)).

¶22. The Special Chancellor awarded Laura $35,000 in lump sum alimony. In 1994, the year Max's income from the *Jackson v. General Motors* case was reported, Max listed on his 1994 tax return an adjusted gross income of $839,051. Laura's income for the same year was $25,759. For the year before the *Jackson v. General Motors* case Max listed his adjusted gross income as $389,961 on his 1993 tax return. Laura's income for the same year was $24,253.

¶23. Max left the marriage with his law practice intact and a history of high earnings. Laura left the marriage with no means of income other than her teaching job. Without other findings based on the *Armstrong* factors, the award of only $35,000 in lump sum alimony by the Special Chancellor is not justified based on the apparent disparities of the parties' incomes. This award evidences an abuse of discretion.

**CONCLUSION**

¶24. We affirm the Special Chancellor's granting of divorce, but reverse and remand on the distribution of property and granting of alimony. On remand the Chancellor is directed to reconsider his distribution of property giving special consideration to Max's income for 1994, and its effect, if any, on the value and debt of the marital property. After reconsideration, he should adjust the distribution of marital property as equity demands if justified by his findings. After reconsideration of the distribution of property, the Chancellor is also to revisit the issue of alimony in light of the differential in income and the other factors discussed enunciated in *Armstrong*. We also direct the Chancellor to support his decision with specific findings in the record.

¶25. **AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

**PRATHER, C.J., SULLIVAN AND PITTMAN, P.JJ., BANKS AND ROBERTS, JJ., CONCUR. McRAE, J., DISSENTS WITH SEPARATE WRITTEN OPINION. SMITH AND MILLS, JJ., NOT PARTICIPATING.**

McRAE, JUSTICE, DISSENTING:

¶26. By authorizing re-consideration of the marital property value of Max's income for 1994, which is primarily comprised of attorneys fees derived from the *Jackson v. General Motors* case, the majority apparently concedes that case fees are income. Yet, the majority opens the floodgates to the pillaging of the public, in general, and of fee-reliant attorneys, in particular, while imprudently modifying the Mississippi Rules of Professional Conduct by which attorneys' ethics are governed. Indeed, the majority attempts to state that income in general is marital property rather than part of the alimony calculation. Such a position is preposterous. Accordingly, I must dissent.

¶27. *Hemsley v. Hemsley*, 639 So. 2d 909, 915 (Miss. 1994), defines marital assets as "property acquired or accumulated during the marriage." Attorney's fees are income effected from personal professional activity. Hence, attorneys fees are not marital assets under *Hemsley*. If such fees, indeed income in general, are marital assets, what remains of the alimony doctrine? Income is to be divided in an alimony calculation. *See Armstrong v. Armstrong*, 618 So. 2d 1278, 1280 (Miss. 1993). Today the majority melds the doctrines of equitable distribution and alimony. I pity the future of divorce law.

¶28. Further, the majority, by so categorizing income, in general, and attorneys' fees, in particular, as marital assets, creates a greater fiasco. Indeed, the majority opens the floodgates to the plundering of the professional integrity of attorneys , who will be required to split fees with laypersons contrary to the ethics rule that prohibits attorneys from sharing legal fees with laypersons. *See* Miss. R. Prof. Conduct 5.4(a). Given today's mandate by the majority, it is foreseeable that defense attorneys who handle tobacco or asbestos cases will have to split their professionally-earned fees as assets that are truly their sole income. Bond lawyers who put together a sale, which is a one-time transaction, face a similar predicament of having to split those one-time professional fees. Other professionals such as architects, physicians, and Realtors will be subjected to the same scrutiny. Indeed, with the direction given by today's Court, how can we again criticize attorneys when they wish to split fees with laypersons for "referral purposes"? We cannot. Today, the unfortunate precedent is set.

¶29. Today's majority sets the stage for combining professional fees with marital assets. Hence, I can do nothing but dissent.

**Endnotes:**

1. When Special Chancellor Robertson failed to file an opinion within six months after trial, on July 18, 1996, Max and Laura jointly appealed to this Court for a Writ of Mandamus to order the Special Chancellor to render a decision. By order of this Court on September 30, 1996, Special Chancellor Robertson was directed to render a decision within thirty days. This Court extended the deadline for a decision from Special Chancellor Robertson and by an Order dated February 5, 1997, directed Special Chancellor Robertson to render a decision within ten days.

2. This assumption is valid because it appears from the record neither party brought much property into the marriage and neither party acquired any property not co-mingled with marital property.

3. Max's calculation of the value of Kilpatrick Farms included a debt of $64,876 owed to Max personally by Kilpatrick Farms. This debt is not included in the farm figures.