917 So.2d 111 (2005)
Gregory Edward PATTERSON, Appellant
v.
Melinda Sue PATTERSON, Appellee.
No. 2004-CA-00741-COA.
Court of Appeals of Mississippi.
June 28, 2005.
Rehearing Denied September 13, 2005.
Certiorari Denied December 15, 2005.
*112 H.J. Davidson, Jr., Columbus, attorney for appellant.
*113 Carrie A. Jourdan, attorney for appellee.
Before LEE, P.J., MYERS and BARNES, JJ.
MYERS, J., for the Court.

STATEMENT OF FACTS
¶ 1. This case arises from the Chancery Court of Lowndes County, Mississippi, in which Greg Patterson and Melinda Patterson obtained a divorce. Melinda, age fifty four, and Greg, age forty four, were married for approximately twenty years and were divorced on the ground of irreconcilable differences. During the marriage, Greg was essentially the sole breadwinner, earning approximately $100,000 annually. Melinda worked part-time on a few occasions, and earned approximately $6,000 annually during the marriage. No children were born to this union.
¶ 2. Prior to the grant of the divorce, Melinda moved out of the marital home to Brandon, Mississippi, where she rented a two bedroom apartment and began a job with APAC, entering data into their computer system, earning approximately $22,000 annually. The chancellor figured Melinda's monthly expenses to total $1,565 and Greg's monthly expenses to be approximately $2,500. Melinda requested $1,000 per month in alimony, this figure being based upon her other requests that her husband pay her Mercury Mountaineer payments and that she receive other equitable division rewards. The chancellor found that under the Armstrong factors, she was entitled to more. Armstrong v. Armstrong, 618 So.2d 1278 (Miss.1993).
¶ 3. Aggrieved by the award of the chancery court, Greg appeals raising the following two issues:
I. WHETHER THE CHANCELLOR ERRED BY CONSIDERING FAULT IN AN IRRECONCILABLE DIFFERENCES DIVORCE, AND USING FAULT AS A FACTOR IN DETERMINING THE AMOUNT OF ALIMONY TO BE PAID.
II. WHETHER THE AMOUNT OF ALIMONY WAS EXCESSIVE AND AN ABUSE OF DISCRETION.
¶ 4. Finding no reversible error, we affirm.

LEGAL ANALYSIS

I. WHETHER THE CHANCELLOR ERRED BY CONSIDERING FAULT IN AN IRRECONCILABLE DIFFERENCES DIVORCE, AND USING FAULT AS A FACTOR IN DETERMINING THE AMOUNT OF ALIMONY TO BE PAID.

STANDARD OF REVIEW
A chancellor's findings of fact will not be disturbed unless manifestly wrong or clearly erroneous. Consolidated Pipe & Supply Co. v. Colter, 735 So.2d 958, 961 (¶ 13) (Miss.1999). "This Court will not disturb the findings of a chancellor when supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong, clearly erroneous or an erroneous legal standard was applied."
Sanderson v. Sanderson, 824 So.2d 623, 625-26 (¶ 8) (Miss.2002) (quoting Kilpatrick v. Kilpatrick, 732 So.2d 876, 880 (¶ 13) (Miss.1999)).

DISCUSSION
¶ 5. Greg first argues that the chancellor erred by considering fault as a factor in determining the amount of alimony which he is to pay Melinda, as the parties were divorced pursuant to an irreconcilable differences, or no fault divorce. Greg contends that, because neither party attempted to introduce fault, the chancellor erred by considering fault when issuing *114 his ruling. Further, Greg argues that since neither party attempted to introduce fault, the chancellor should have excluded such evidence in accordance with Burge v. Burge, 851 So.2d 384 (Miss.Ct.App.2003).
¶ 6. Melinda contends that the chancellor did not err, because of his reliance upon the Driste opinion, which states "[t]he fact that both spouses agree to a divorce does not eliminate the consideration of the fault factor in determining alimony." Driste v. Driste, 738 So.2d 763, 766 (¶ 9) (Miss.Ct.App.1999). Melinda argues that by stating in the opinion when addressing fault, "fault (the separation of the husband without explanation)," the chancellor was merely stating the law by listing the factors and such a comment does not imply any punitive intent in the chancellor's decision. Melinda further argues that there was no direct introduction of evidence of Greg's abandonment, but rather the discussion of abandonment was indirect, while discussing the issue of living arrangements and payment of bills prior to the divorce.
¶ 7. Upon review of the record, it cannot be stated that the chancellor abused his discretion by making this comment. After the chancellor issued his opinion, Greg filed a motion for reconsideration arguing that the statement regarding fault was improper. The chancellor denied Greg's request, stating that "[f]ault is a factor which may be considered in awarding alimony and/or an equitable division and therefore can be considered on those issues in a hearing where an irreconcilable differences divorce is being granted." Driste, 738 So.2d at 765-66 (¶¶ 8-9). It is clear from the chancellor's opinion, and further supported by his order denying Greg's motion for reconsideration, that by addressing fault, the chancellor was performing a thorough review of all of the Armstrong factors and speaking to each one individually so as to fully explain his determination of alimony.
¶ 8. Greg further argues that to allow the mention of fault in a no-fault divorce was clearly erroneous. Greg argues that evidence of fault was not introduced, and therefore, any determination of alimony based upon this factor is in error. In support of this contention, Greg cites the case of Burge v. Burge, in which we held:
In Mississippi, consent proceedings are by definition no-fault proceedings; any evidence showing that the divorce was the fault of either party is to be eschewed. The intent of our no-fault divorce statute is to allow parties to agree to avoid the necessity of publicly putting on proofs of private matters.
Burge, 851 So.2d at 387 (¶ 11) (citing Perkins v. Perkins, 787 So.2d 1256, 1263 (¶ 21) (Miss 2001)).
¶ 9. Though this is a correct statement of the law, Greg has misconstrued this language, as the Burge decision is readily distinguished from the case sub judice. In the Burge decision, Shelton Burge originally filed for divorce from his wife alleging habitual cruel and inhuman treatment as well as adultery, pursuant to Mississippi Code Annotated § 93-5-1 (Rev.2004), which lists the twelve causes for divorce. Id. Lisa Marie Burge filed a cross-complaint against Shelton in which she made the same allegations. Id. The parties then came to an agreement and decided to withdraw their contested pleadings and apply for a consent divorce. Id. After obtaining permission to proceed as a consent divorce, Shelton attempted to introduce evidence of Lisa Marie's infidelity at trial, in an attempt to reduce the award of alimony. Id. We held that the chancellor correctly rejected the offer of such proof, as the intentional elicitation of such proof is improper in no-contest proceedings. Id.
*115 ¶ 10. In the case sub judice, Greg argues that the introduction of fault was improper, as he and Melinda's divorce was based upon consent grounds. In order to adequately discuss this issue, it is necessary to quote rather extensively from the trial transcript, as the subject of Greg's abandonment of Melinda came up on several occasions, and it is necessary to convey the context in which such testimony was introduced. The first mention of Greg's abandonment was as follows:
Q. Okay. Now, Mrs. Patterson, how long were you and Greg married when Mr. Patterson left the marital home? How long had y'all been married at that point?
A. It was almost 20 years.
Q. Okay.
A. We  he left in August, I believe, and our 20th anniversary would have been in October.
Q. Okay. And just so the Court  what year would that have been?
A. That was 
Q. Was that 2002?
A. 2002, yes.
Q. Okay. At the time that Mr. Patterson left the home, how did the finances continue? What happened during that time period?
A. Well, at the time, I was working part-time as a floral designer, so I wasn't making very much money, but, you know 
¶ 11. As this testimony demonstrates, this line of questioning was not intended to establish that Greg had abandoned Melinda, but rather to establish the length of the marriage and the financial contributions of the parties. Later in the trial, while discussing the payments for Melinda's Mercury Mountaineer, it was again mentioned that Greg had left the marital home. This exchange was as follows:
Q. Okay. Who has made the car payments and insured it during this time?
A. Greg has. He has.
Q. And that  that bill is in  that car is in the both of your names?
A. Right. It is.
Q. Tell the Court what kind of car that is.
A. It's a 2000 Mountaineer.
Q. Okay. And if you know, you had the opportunity  what do you believe is the time span of the payments left on that car?
A. I'm not positive, but I think it's about a year and a half maybe. I'm not real sure, but I think that's right.
Q. Okay. Okay. Since Mr. Patterson left the home in August of 2002, have you had any knowledge of the finances or any more ability to 
A. No.
Q. He took over that?
A. Yes, he did.
¶ 12. It is clear from this testimony that the intention of the questioning was to determine how the payments of Melinda's vehicle were being made, not to establish marital fault. The next mention of Greg's leaving is during the discussion of whether Melinda was receiving any money from Greg for living expenses. This line of questioning took place as follows:
Q. Has he given you any money, any money to assist with the moving, living, anything?
A. No.
Q. Since he left  now, you indicated to the Court he paid the bills?
A. Yes, he did do that.
Q. But he didn't give you not a red cent from the time he left in August of 2002 to here today?

*116 A. No. The only thing, he would put money in the account for the bills.
¶ 13. Lastly, Melinda's attorney asked a line of questions which pertained to Melinda's filing for divorce and the effect the filing would have on her cancer insurance.
Q. Mrs. Patterson, Mr. Patterson left in August of 2002; is that correct?
A. That's correct.
Q. And if you recall, when did you  when did you file the complaint for divorce?
A. I think it was in January.
Q. Okay. So you didn't file for six months?
A. Right.
Q. Okay. Mrs. Patterson, just one other question. You  because of your previous health problems, you had for years maintained cancer insurance?
A. Uh-huh.
Q. Were you able to keep your cancer insurance?
A. No.
Q. Okay. Tell this Court why.
A. I couldn't afford it.
Q. So you had to drop it?
A. I had to drop it. Uh-huh.
Q. Despite this history that you've had 
A. Right.
Q. you had to drop your cancer insurance?
A. Right. I did.
Q. Did you expect to be here after your 20 years of marriage, Mrs. Patterson?
A. No, I did not.
Q. Okay.
A. No.
Q. When you filed, was there any hope that Mr. Patterson would come home?
A. Well, I hoped, but he was very adamant that he was not coming back, so 
Q. Okay. Did you believe during your marriage that what the two of you were doing you were doing together?
A. Absolutely. I was never given any reason not to.
¶ 14. During redirect examination, Melinda's attorney then asked Melinda about the court's denial of an award of temporary alimony, Greg's decision to rent out the marital home, and the effect these had on her decision to move to Brandon, Mississippi. The exchange took place as follows:
Q. Melinda or Mrs. Patterson, Mr. Patterson left you in August of 2002. You've already told the Court that?
A. Yes.
Q. You filed your complaint at the very end or the beginning of the year as you recall it. Mr. Patterson made it clear he wasn't coming back home?
A. That's very true.
Q. You were  the Court declined to award you any type of temporary alimony?
A. That's correct.
Q. Did Mr. Patterson indicate to you that he was not going to give you any extra money for your living expenses?
A. That is correct.
Q. Did you have any family here?
A. No.
Q. Okay. Did you feel you had to get a job and make some effort at becoming self-sufficient?
A. Yes, I did, absolutely.
Q. Did you have any other options as you saw it?
A. No, I did not.
Q. Okay. Now, did Mr. Patterson want you out of the house?
A. Yes, he did.

*117 Q. And had he asked you repeatedly to move out of the house?
A. Yes, he did.
Q. And that wasn't just when you got the job to [sic] Jackson, was it?
A. No.
Q. How early did he start asking you to move out of the house?
A. I don't remember the exact time frame, but, you know, as soon as I got the job, then he was really pushing me to move. And I had agreed to do so, but 
Q. Okay. Is there any way absent the Court making him pay for the house and pay the utilities that you could have maintained this home on your own?
A. Absolutely not. No.
Q. Are you  if you were to compare your lifestyles to what you had then versus now, would you say that Mr. Patterson is still able to maintain the lifestyle that the two of you had?
A. Oh, I'm sure. Yes.
Q. Okay. All right.
¶ 15. During the cross-examination of Greg, Melinda's attorney inquired as to the impact Melinda's move to Jackson had on Greg's personal finances, as it freed up the marital home so that it might be rented. This line of questioning is as follows:
Q. Mr. Patterson, when you left in August, you made it plain you were not coming back; is that correct?
A. I had made up my mind up [sic], yes.
Q. Okay. And Mrs. Patterson asked you to return?
A. Yes.
Q. But, again, you're  you were firm, and you were not coming back?
A. That's correct.
Q. And you're not trying to tell the Court that her decision to cooperate, get a job, become self-sufficient, get health insurance, allow you to rent the house out, you're not trying to tell the Court that you didn't benefit from all of those decisions?
A. No.
Q. Because if we were here today and she was sitting in that house making $500 a month, not able to get a job in Columbus, Mississippi, the picture would be a lot different for the both of you, wouldn't it?
A. It would, but I would still be paying the bills.
Q. Okay. And her decisions  I did a little figuring did [sic]almost gave to you a $2,000 increase in terms of what was going out of your income, because now you've got the house rented for almost the entire mortgage. You don't have to pay almost $500 a month in house insurance. That's almost $2,000 a month that those decisions netted to you in terms of an increase.
A. I don't know what you mean exactly by net. I mean, I still have the bills and have to pay it.
Q. Well, let me say it another way. Those things were coming out of your pocket, and now they're not, the mortgage?
A. The mortgage is still coming out of my pocket.
Q. But it's  you're getting 1350. You've got the mortgage on here as 1100, and you testified 
A. It's income.
Q. Yeah.
A. And I've  I've got it marked as income, so 
Q. But, again, those are benefits to you?
A. Yes.
*118 ¶ 16. Thus, it is clear from the transcript that there was not deliberate introduction of fault into evidence. During closing arguments, Melinda's attorney clarified that evidence of fault was not being deliberately introduced, by stating, "You know, we've consented to the divorce here today, your Honor, and fault is not an issue, but clearly the parties have been candid with the Court." This Court has previously held that such introduction is proper. In Driste, we stated:
We hold that limited testimony regarding all the Armstrong factors can be introduced even in an uncontested divorce. However, the chancellor should exercise discretion to restrict the evidence such that the determination of relative fault for purposes of awarding alimony does not become the equivalent of trying a contested divorce.... The fact that both spouses agree to a divorce does not eliminate the consideration of the fault factor in determining alimony.
Driste, 738 So.2d at 766 (¶ 9).
¶ 17. The Driste opinion states very clearly that evidence of each of the Armstrong factors is admissible, even in an uncontested divorce, while cautioning that evidence of fault should be admitted only after careful review by the chancellor. As such, the testimony regarding fault in the case sub judice was not direct evidence showing that Greg's abandonment of Melinda was the cause for divorce. It should be noted that Greg's leaving the marital home does not meet the one year minimum abandonment requirement as set forth by Mississippi Code Annotated § 93-5-1, and Melinda's original complaint for divorce based upon fault grounds did not list abandonment as a ground for divorce. This in itself tends to show that questions regarding Greg's actions were not to show fault but rather to show the manner in which his actions impacted the financial conditions of both parties.
¶ 18. Further, the chancellor noted in his opinion the twelve Armstrong factors, which are used to determine alimony. These twelve factors consist of: (1) the income and expenses of the parties; (2) the health and earning capacities of the parties; (3) the needs of each party; (4) the obligations and assets of each party; (5) the length of the marriage; (6) the presence or absence of minor children in the home, which may require that one or both of the parties either pay, or personally provide, child care; (7) the age of the parties; (8) the standard of living of the parties, both during the marriage and at the time of the support determination; (9) the tax consequences of the spousal support order; (10) fault or misconduct; (11) wasteful dissipation of assets by either party; and (12) any other factor deemed by the court to be "just and equitable" in connection with the setting of spousal support. Armstrong, 618 So.2d at 1280. The chancellor in addressing the issue of alimony stated that he based his award of alimony upon these twelve factors and was merely commenting on the fault factor by stating, "the separation of the husband without explanation." There is no indication that this factor was the driving factor in establishing the award of alimony.
¶ 19. In light of the Driste decision, it cannot be stated that the findings of the chancellor were manifestly wrong or clearly erroneous. Therefore, the findings of the chancellor will be left undisturbed.

II. WHETHER THE AMOUNT OF ALIMONY WAS EXCESSIVE AND AN ABUSE OF DISCRETION.

STANDARD OF REVIEW
¶ 20. This issue, which also deals with the chancellor's findings, implicates the same standard of review as employed under *119 Issue I, namely, the abuse of discretion, manifest error, clearly erroneous standard. Sanderson, 824 So.2d at 625-26.

DISCUSSION
¶ 21. Greg next argues that the amount of alimony awarded Melinda was excessive and thus, an abuse of discretion by the chancellor. Greg's argument is premised on the equitable distribution of the marital assets and application of the Armstrong factors. Greg essentially argues that the chancellor's award of $2,000 alimony per month was excessive and punishment for Greg's actions, as Melinda only requested $1,000 per month alimony.
¶ 22. Greg's argument is prefaced by a breakdown of the chancellor's equitable distribution of the marital property, which is as follows:

 Greg Melinda
 $12,000 = approximate equity in house $54,000 = ½ of Greg's 401(k)
 $ 3,500 = value of 1996 Dodge $ 7,700 = approx. equity in Mercury
 $ 1,200 = approx. equity in camper $ 200 = amount in checking account
 $54,000 = ½ of 401(k) $13,500 = value of household goods
 $ 7,000 = amount in checking account
 $ 1,500 = value of household goods
 _______ _______
 $79,200 = Subtotal $75,400 = Subtotal
 -20,000 = credit card debt 3,500 = credit card debt
 _______ _______
 $59,200 = net total $71,900 = net total
 + 2,000 per month alimony

¶ 23. Greg argues that these figures illustrate that an unjust result was reached by the chancellor in determining the amount of alimony. Though at first blush, Greg's argument would appear to have merit, this is not the case. Upon a thorough review of the record, it appears that Greg's calculations omit certain key figures. During trial, both parties testified that Greg earned approximately $100,000 per year. Using Greg's 2003 earnings of $98,502.80, a more complete picture is as follows:

 Greg Melinda
 $ 59,200 = net total $ 71,900 = net total
 $ 98,502.80 = yearly salary $ 24,000 = yearly alimony
 ___________
 $157,702.80 $ 21,720 = yearly salary
 - 24,000 = yearly alimony payments
 ___________ ________
 $133,702.80 $117,620

¶ 24. As illustrated by the complete financial computations, even with the equitable division of the marital property during this year, Greg continues to have a higher annual income than does Melinda. It should be noted that during every other year after this equitable division is made Greg will retain approximately $74,502.80 (based upon 2003 income figures) after paying $24,000 in alimony while Melinda will receive approximately $45,720 (based upon 2003 income figures) after receiving the year's total alimony payments. Such a result can hardly be stated to be an abuse of the chancellor's discretion. Therefore, the chancellor's award of alimony in the amount of $2,000 per month will not be disturbed.
*120 ¶ 25. THE JUDGMENT OF THE CHANCERY COURT OF LOWNDES COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., BRIDGES AND LEE, P.JJ., CHANDLER, GRIFFIS, BARNES AND ISHEE, JJ., CONCUR. IRVING, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.