# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-CA-00776-COA

**W. B. WILLIAMS**                                                    **APPELLANT**

**v.**

**MAGNOLIA WILLIAMS**                                              **APPELLEE**

DATE OF JUDGMENT:              04/18/2019
TRIAL JUDGE:                  HON. CATHERINE FARRIS-CARTER
COURT FROM WHICH APPEALED:    COAHOMA COUNTY CHANCERY COURT
ATTORNEYS FOR APPELLANT:      DEREK D. HOPSON SR.
                              DEWAYNE HOPSON JR.
ATTORNEY FOR APPELLEE:        WILLIAM O. LUCKETT JR.
NATURE OF THE CASE:           CIVIL - DOMESTIC RELATIONS
DISPOSITION:                  AFFIRMED IN PART; REVERSED AND
                              REMANDED IN PART - 09/15/2020
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE CARLTON, P.J., WESTBROOKS AND LAWRENCE, JJ.**

**LAWRENCE, J., FOR THE COURT:**

¶1. On February 15, 2019, the Coahoma County Chancery Court granted Magnolia Williams a divorce from W. B. Williams on the ground of adultery. Following W.B.'s motion for reconsideration, the chancery court modified the final judgment. W.B. appeals, claiming that the chancery court erred in (1) granting Magnolia a divorce on the ground of adultery; (2) drawing the line of demarcation at Magnolia's complaint for divorce; (3) dividing the marital property; and (4) awarding Magnolia alimony.

¶2. After review, we affirm the chancery court's grant of a divorce based on the ground of adultery. However, we find that the chancery court failed to make sufficient findings of

fact as to the value of the marital assets. We also find that the chancellor failed to consider the applicable *Ferguson*[1] factors when dividing the marital property. Accordingly, we reverse the chancery court's judgment as to the equitable distribution of marital property and alimony and remand for proceedings consistent with this opinion.

## FACTS AND PROCEDURAL HISTORY

¶3. W.B. and Magnolia Williams married in June 1973. They have two children together—Lisa Williams, who was born in 1971, and Wesley Williams, who was born in 1972. Although W.B. and Magnolia agreed that they separated as husband and wife around 1988, they never filed for divorce until Magnolia did so in 2018. Further, once separated, they never lived together again during the thirty years of separation.

¶4. On April 5, 2018, Magnolia filed a complaint for divorce on the grounds of habitual cruel and inhuman treatment and adultery or, in the alternative, irreconcilable differences. Magnolia also sought possession of the marital home and requested both rehabilitative alimony and periodic alimony.

¶5. On May 4, 2018, W.B. filed his answer, affirmative defenses, and counterclaim for divorce. He denied Magnolia's claims of habitual cruel and inhuman treatment and adultery. Additionally, W.B. sought a divorce on the grounds of desertion, cruel and inhuman treatment or, in the alternative, irreconcilable differences. During their years of separation, W.B. owned and ran several businesses, including a bar, a restaurant, a car dealership, and three rental properties. W.B. and Magnolia shared title to all the properties except the three

---

[1] *Ferguson v. Ferguson*, 639 So. 2d 921, 928 (Miss. 1994).

rental properties, and Magnolia assisted in running all the businesses and helped with filing tax forms.

## I. Divorce Hearing

¶6. The court held a trial on February 5, 2019. At that time, W.B. was sixty-nine years old and Magnolia was sixty-seven years old. Magnolia testified that she and W.B. moved to Jonestown, Mississippi, soon after they married. At the time of the hearing, Magnolia still lived in the marital home. Magnolia testified that she and W.B. separated at some point between 1973 and 1990, explaining their separation was "an ongoing one." W.B. testified that he and Magnolia separated in 1988 and that they never tried to reconcile.

¶7. Throughout the 1970s and 1980s, Magnolia learned that W.B. had fathered several children during the course of their marriage. As a devout Jehovah's Witness, Magnolia remained married to W.B., hoping that he would "come in" by the time he turned sixty years old. W.B.'s adultery continued, and he fathered more children with different women. Because W.B. could not read or write, Magnolia assisted him in filing his tax returns each year and actually listed each of the illegitimate children on W.B.'s taxes. In 1983, Magnolia took medication after she suffered a "minor mental lapse" because of W.B.'s lifestyle.[2] Magnolia testified that she never forgave W.B. for his adulterous actions.

¶8. In the early 1980s, W.B. and Magnolia purchased a piece of property and started a

---

[2] In 2006, Magnolia had another mental lapse and was diagnosed with bipolar disorder.

small restaurant called Edna's Kitchen. The couple also purchased another property[3] in the same building, where they ran a separate business—a pool hall. Again, because W.B. was illiterate, Magnolia managed the finances and solely handled the bookkeeping, taxes, titles, deeds, and all other documentation related to Edna's Kitchen and the pool hall. Edna's Kitchen closed after five years. Thereafter, W.B. used Edna's Kitchen as a disco to compliment the pool hall. Although Magnolia continued in her role as the financial manager, she refused to enter the disco for religious reasons.

¶9. In 2007, Magnolia purchased a home in Memphis, Tennessee for their daughter. W.B. had no involvement in the purchase. Magnolia testified that she still owed $92,000 on the mortgage and that she paid a $654 monthly note. She also testified that she paid the light bills and water bills for the Memphis home. W.B.'s name was not on the Memphis home, and he never contributed any money to its purchase or mortgage payments.

¶10. In 2017, Magnolia began receiving supplemental Social Security income. In 2018, Magnolia received roughly $24,000 in settlement funds as a result of lawsuits against three different pharmaceutical companies. She testified that she used the money to hire a lawyer and file for divorce.

¶11. According to Magnolia, W.B. helped her sparingly with financials throughout the past ten to twenty years, only "paying just what he wanted to," such as light bills and water bills for the marital home. W.B. also supported her financially when she attended her religious conventions. Magnolia testified that W.B. did not substantially pay her for anything else.

---

[3] Although Edna's Kitchen and the pool hall are in the same building, each has its own separate deed.

¶12. Magnolia's Rule 8.05 financial statement listed her monthly income as $229, with $37 from Social Security benefits and $192 from public assistance. Her monthly expenses totaled $2,499.37. Magnolia listed three properties in her statement of assets: (1) the marital home, valued at $64,000; (2) Edna's Kitchen and the pool hall, valued at $30,000; and (3) the Memphis home, valued at $82,000.[4]

¶13. W.B. testified that he had been living in a back room of Edna's Kitchen and the pool hall since their separation. W.B. admitted that Magnolia never forgave him for his adultery.

¶14. W.B. also testified that he gave Magnolia $625 a week until he turned sixty-two years old, when he began to draw Social Security benefits and "cut the business down." According to W.B., Magnolia suffered from a "mental breakdown" around that time and told W.B. "not to worry about the [$]625 a month no more."

¶15. At the time of trial, W.B. ran Edna's Kitchen (as a disco) and the pool hall on a part-time basis. He testified that most of his profits were from Edna's Kitchen and that the pool hall generated virtually nothing. Although the profits from the two businesses were low, W.B. continued to operate them because he lived in the building mortgage-free. Additionally, W.B. and one of his sons ran a business together: Williams and Williams Used Cars. He testified that he no longer sold cars but had inventory on the lot. W.B. also testified that the majority of his income came from three rental properties he acquired during the marriage. According to W.B., Magnolia took care of his businesses "all her life."

¶16. W.B.'s Rule 8.05 financial statement listed his monthly income as $2,682, which

---

[4] Magnolia's trial testimony differed from her Rule 8.05 financial statement, which listed the mortgage at $82,000 with a monthly payment of $629.

included $582 in Social Security benefits, $1,500 from his three rental properties, and $600 from Edna's Kitchen and the pool hall. He listed his monthly expenses as $2,480.18. W.B. claimed the following as marital assets: (1) the marital home, valued at $34,193; (2) Edna's Kitchen and the pool hall, valued at $12,177; (3) Williams and Williams Used Cars, valued at $9,039; (4) three rental properties, valued at $36,265, $36,210, and $40,886, respectively; and (5) the Memphis home, valued at $101,100.

¶17.    On February 15, 2019, the chancery court issued a final judgment granting Magnolia a divorce on the ground of adultery. The court further determined that "any and all property held by the parties was acquired during the marriage and [] considered marital property." As part of the property division, the court awarded Magnolia the exclusive use, possession, and ownership of the marital home and the Memphis home. The court also awarded Magnolia exclusive use, possession, and ownership of Edna's Kitchen beginning January 1, 2020.

¶18.    The court granted W.B. exclusive use, possession, and ownership of the pool hall and Williams and Williams Used Cars.[5] The court further ordered the parties to deed all three rental properties jointly with full rights of survivorship to both W.B. and Magnolia, with W.B. maintaining primary control to generate income.

¶19.    Finally, the court ordered W.B. to pay Magnolia periodic alimony. More specifically, the court ordered W.B. to pay Magnolia $1,500 per month from March 1, 2019 to December 1, 2019. Thereafter, the court reduced the payment to $1,250 every month thereafter. The parties subsequently prepared a written order, which the chancellor signed on February 15,

---

[5] The written order included W.B.'s used car business, though that business was not mentioned in the bench ruling.

6

2019.

## II. Motion for Reconsideration Hearing

¶20.    W.B. filed a motion for reconsideration on February 25, 2019.  W.B. argued that (1) the final judgment of divorce did not contain a clear line of demarcation, which he contended was their separation in 1988; (2) the division of the marital property was inequitable because it was not equally divided; (3) W.B.'s loss of income from Edna's Kitchen and the sporadic rent payments from his three rental properties inhibited his ability to pay alimony; (4) Magnolia's periodic alimony award allowed her to live a better lifestyle than she had during the marriage; and (5) Magnolia condoned W.B.'s adultery and therefore was not entitled to a divorce on that ground.

¶21.    The court held a hearing on March 26, 2019.  W.B. first argued that he was unable to pay the ordered alimony award.  He explained that the income from his rental properties was not guaranteed each month because his tenants did not always pay on time.  W.B. further argued that the date of demarcation was between 1988 and 1990, when he and Magnolia officially separated.  To that end, he contended that the marital property should have been divided based on their date of separation.  Finally, he claimed the property division was inequitable because Magnolia benefitted, either directly or indirectly, from all the property divided between them.

¶22.    Following the hearing, the chancery court issued a final judgment on the motion for consideration.  In the judgment, the court clarified its decision as to the intended line of demarcation—April 5, 2018, the date Magnolia filed for divorce.  The court also modified

7

its decision as to Edna's Kitchen and the pool hall. The court categorized the property as both W.B.'s business asset and personal residence and specified that the income from Edna's Kitchen and the pool hall was needed to ensure a reasonable amount of alimony. The court further ordered the parties to jointly obtain an appraisal of both properties or, in the alternative, mutually agree to the local tax assessor's determined value. W.B. would then have the option to purchase Magnolia's one-half interest in the two properties at a cost of sixty-five percent of the assessed properties' values.

¶23. The chancery court also elaborated its ruling on the three rental properties, ordering W.B. to first use the profits from the rental properties to pay the properties' debts and obligations. Additionally, the court ordered W.B. to maintain all necessary records to properly document the gains and losses associated with the three properties and open a bank account to ensure that the properties were maintained in proper rental condition. The court further ordered W.B. and Magnolia to share the excess reserve funds from these properties on May 15 of each year, beginning on May 15, 2020.

¶24. Lastly, the chancery court modified Magnolia's alimony award. The court changed the end-date of the $1,500 monthly alimony payment from December 2019 to June 2019. Further, the court reduced the remaining payments from $1,250 to $1,000, beginning on July 1, 2019.

¶25. Aggrieved by the chancery court's judgment, W.B. appealed.

**STANDARD OF REVIEW**

¶26. "When [an appellate court] reviews a chancellor's decision in a case involving divorce

and all related issues, [the court's] scope of review is limited by the substantial evidence/manifest error rule." *Yelverton v. Yelverton*, 961 So. 2d 19, 24 (¶6) (Miss. 2007). Therefore, this Court will not disturb the chancellor's findings "unless the chancellor was manifestly wrong [or] clearly erroneous[,] or a clearly erroneous standard was applied." *Id*.

**ANALYSIS**

### 1. Ground for Divorce

¶27. W.B. argues that the chancery court erred granting Magnolia a divorce on the ground of adultery. Specifically, he claims that Magnolia condoned the adultery and therefore cannot be awarded a divorce on that ground.

¶28. "In Mississippi one seeking a divorce on the grounds of adulterous activity must show by clear and convincing evidence both an adulterous inclination and a reasonable opportunity to satisfy that inclination." *Holden v. Frasher-Holden*, 680 So. 2d 795, 798 (Miss. 1996). "Adultery may be shown by evidence or admissions[,] and either [is] sufficient to support a decree of divorce." *Id*. at 799 (internal quotation marks omitted). "[I]n cases concerning an allegation of adultery, the chancellor is required to make a finding of fact." *McAdory v. McAdory*, 608 So. 2d 695, 699 (Miss. 1992) (citing *Dillon v. Dillon*, 498 So. 2d 328, 330 (Miss. 1986)). When a chancellor makes such findings of fact, this Court will not set aside those findings unless they are manifestly wrong. *Id*.

¶29. At trial, the testimony of W.B. confirmed that he had numerous affairs during the course of the marriage. He testified he had at least six children with other woman during the years of separation. He explained that he thought he was no longer married after his

9

separation and that he lived his life accordingly. Finally, he confirmed the Mississippi Department of Human Services had sued him to establish paternity for three children, and he was ordered to pay child support after DNA testing. Given W.B.'s testimony, we find there is substantial evidence in the record to support the court's granting of a divorce on adultery. We must now turn to whether Magnolia condoned the adultery as alleged by W.B.

¶30. Condonation is a defense to adultery. *Gerty v. Gerty*, 265 So. 3d 121, 132 (¶39) (Miss. 2018). "Condonation is the forgiveness of a marital wrong on the part of the wronged party . . . [and] may be expressed or implied." *Id*. W.B. pled condonation as an affirmative defense and maintained his position throughout the trial. At trial, when the chancellor asked Magnolia whether she had forgiven W.B. for his adultery, she responded, "Never." Further, W.B. admitted that Magnolia never forgave him for his adultery. Based on that testimony and W.B.'s persistent adultery throughout the entire marriage, the chancellor ultimately found that Magnolia did not condone W.B.'s adultery and awarded her a divorce on that ground. The record clearly supports the chancellor's fact findings. Accordingly, this issue is without merit.

### 2. Line of Demarcation

¶31. W.B. further argues that the chancellor erred in finding the date of Magnolia's divorce complaint as the line of demarcation and should have instead used the date of separation. "The law in Mississippi is that the date on which assets cease to be marital and become separate assets—what we refer to . . . as the point of demarcation—can be 'either the date of separation (at the earliest) or the date of divorce (at the latest).'" *Collins v. Collins*, 112

10

So. 3d 428, 431-32 (¶9) (Miss. 2013) (quoting *Lowrey v. Lowrey*, 25 So. 3d 274, 285 (¶27) (Miss. 2009)). "Ultimately, however, the chancellor has the discretion to draw the line of demarcation." *Randolph v. Randolph*, 199 So. 3d 1282, 1285 (¶9) (Miss. Ct. App. 2016) (citing *Collins*, 112 So. 3d at 432 at (¶10)).

¶32. Neither the chancery court's bench ruling nor the written final judgment provided a date for the point of demarcation. In the final judgment on the motion for reconsideration, the court clarified that the date of Magnolia's complaint for divorce (April 5, 2018) was the intended point of demarcation. The chancellor reasoned that throughout the entirety of their marriage, even following their separation, "[W.B. and Magnolia] moved as a unit with regards to the business, social, family, a community aspects of their lives." Given the broad discretion afforded to the chancellor in drawing the line of demarcation, we are not persuaded by W.B.'s argument. Thus, we affirm the chancellor's decision on this issue.

### 3. Equitable Distribution

¶33. W.B. argues that the chancery court erred in its equitable distribution. More specifically, W.B. claims that the chancellor failed to value the marital assets and consider the *Ferguson* factors in dividing the marital property. To equitably divide property, the chancellor must: (1) classify the parties' assets as marital or separate, (2) value those assets, and (3) equitably divide the marital assets. *Hemsley v. Hemsley*, 639 So. 2d 909, 914 (Miss. 1994); *Ferguson*, 639 So. 2d at 928. In *Johnson v. Johnson*, 650 So. 2d 1281, 1287 (Miss. 1994), our supreme court stated that all marital assets are subject to needed equitable distribution in accordance with the factors provided in *Ferguson*. "Assets acquired or

accumulated during the course of a marriage are subject to equitable division unless it can be shown by proof that such assets are attributable to one of the parties' separate estates prior to the marriage or outside of the marriage." *Hemsley*, 639 So. 2d at 914.

¶34.    "[A]n equitable division of property does not necessarily mean an equal division of property." *Chamblee v. Chamblee*, 637 So. 2d 850, 863-64 (Miss. 1994). "[F]airness is the prevailing guideline in marital division." *Ferguson*, 639 So. 2d at 929. When reviewing a chancellor's equitable distribution, "[r]eversal is warranted 'only where the failure to make sufficient findings of fact and conclusions of law constitute[s] manifest error.'" *Randolph*, 199 So. 3d at 1287 (quoting *Selman v. Selman*, 722 So. 2d 547, 554 (¶29) (Miss. 1998)).

### A.    The chancellor failed to value the marital assets.

¶35.    "[T]he foundational step to make an equitable distribution of marital assets is to determine the value of those assets based on competent proof." *Dunaway v. Dunaway*, 749 So. 2d 1112, 1118 (¶14) (Miss. Ct. App. 1999) (citing *Ferguson*, 639 So. 2d at 929). "The valuation of the property is a question of fact." *Messer v. Messer*, 850 So. 2d 161, 170 (¶42) (Miss. Ct. App. 2003) (citing *Ward v. Ward*, 825 So. 2d 713, 719 (¶21) (Miss. Ct. App. 2002)). Further, the chancellor has sole authority to assess both the credibility and weight of witness testimony. *Culumber v. Culumber*, 261 So. 3d 1142, 1150 (¶24) (Miss. Ct. App. 2018).

¶36.    Here, the chancellor failed to value the marital assets before dividing them between W.B. and Magnolia. As a result, the chancellor failed to make findings of fact as to the differing property values listed in the parties' Rule 8.05 financial statements. For example,

12

W.B. listed the value of the marital home at $34,193, and Magnolia listed the value at $64,000. Additionally, W.B. listed the value of Edna's Kitchen and the pool hall at $12,177, and Magnolia listed the value at $30,000. For the Memphis home, Magnolia listed the value at $82,000, while W.B. listed the value at $101,100.

¶37.    Simply put, it is impossible to know from the chancellor's order what values were assigned to those properties because she never resolved any of those discrepancies. Based on the lack of findings of fact as to those values, we are unable to conduct an appropriate appellate review to determine whether the chancellor abused her discretion. Accordingly, we reverse and remand on this issue so that the chancellor has the opportunity to make those findings.

### B.    The chancellor failed to consider the *Ferguson* factors.

¶38.    In *Ferguson*, the Mississippi Supreme Court stated:

> Given the development of domestic relations law, this Court recognizes the need for guidelines to aid chancellors in their adjudication of marital property division. Therefore, this Court directs the chancery courts to evaluate the division of marital assets by the following guidelines and to support their decisions with findings of fact and conclusions of law for purposes of appellate review.

*Ferguson*, 639 So. 2d at 928 (emphasis added). Further, "[t]o aid in appellate review, findings of fact by the chancellor, together with legal conclusions drawn from those findings, **are required**." *Id*. at 929 (emphasis added). In *Lowrey*, the Mississippi Supreme Court elaborated that applicable *Ferguson* factors "must be considered on the record in every case." *Lowrey*, 25 So. 3d at 285 (¶7). However, only those factors "applicable" to the property in question must be considered. *Sproles v. Sproles*, 782 So. 2d 742, 748 (¶25) (Miss. 2001)

13

(citing *Weathersby v. Weathersby*, 693 So. 2d 1348, 1354 (Miss. 1997)).  The *Ferguson* factors include, but are not limited to:

> 1. Substantial contribution to the accumulation of the property. Factors to be considered in determining contribution are as follows:
>
>> a. Direct or indirect economic contribution to the acquisition of the property;
>>
>> b. Contribution to the stability and harmony of the marital and family relationships as measured by quality, quantity of time spent on family duties and duration of the marriage; and
>>
>> c. Contribution to the education, training or other accomplishment bearing on the earning power of the spouse accumulating the assets.
>
> 2. The degree to which each spouse has expended, withdrawn or otherwise disposed of marital assets and any prior distribution of such assets by agreement, decree or otherwise.
>
> 3. The market value and the emotional value of the assets subject to distribution.
>
> 4. The value of assets not ordinarily, absent equitable factors to the contrary, subject to such distribution, such as property brought to the marriage by the parties and property acquired by inheritance or inter vivos gift by or to an individual spouse;
>
> 5. Tax and other economic consequences, and contractual or legal consequences to third parties, of the proposed distribution;
>
> 6. The extent to which property division may, with equity to both parties, be utilized to eliminate periodic payments and other potential sources of future friction between the parties;
>
> 7. The needs of the parties for financial security with due regard to the combination of assets, income and earning capacity; and,
>
> 8. Any other factor which in equity should be considered.

*Id*. at 928.

¶39. Here, the record is silent as to whether the chancellor considered the *Ferguson* factors at all. In her bench ruling, the chancellor awarded Magnolia a divorce on the ground of adultery, skipped any valuation, then immediately proceeded to divide the marital property, without any mention of the *Ferguson* factors. Further, she provided no discussion or reference to any of the factors in the written final judgment or the final judgment on the motion for reconsideration. In *Kilpatrick v. Kilpatrick*, 732 So. 2d 876, 881 (¶19) (Miss. 1999), the Mississippi Supreme Court reversed the chancery court's judgment when the chancellor failed to make the required findings of fact and conclusions of law in dividing the marital property. The court reasoned that "[w]ithout findings from the [c]hancellor . . . , we cannot determine if the distribution of property outlined . . . meets the standards of equitable distribution by *Ferguson*." *Id.*; *see also Heigle v. Heigle*, 771 So. 2d 341, 348 (¶21) (Miss. 2000) (reversed and remanded for further findings because "the chancellor made no conclusions of law to support the division of the marital estate"); *Johnson v. Johnson*, 823 So. 2d 1156, 1161 (¶12) (Miss. 2002) (reversed for the chancellor's failure to provide "specific findings of fact and conclusions of law" in regard to the *Ferguson* factors); *Lauro v. Lauro*, 847 So. 2d 843, 847 (¶10) (Miss. 2003) (reversed for the chancellor's failure to make specific findings as to how the marital property was classified and divided).

¶40. Similarly here, "there are no specific findings in the record to show [the chancellor] considered the *Ferguson* guidelines and applied those guidelines to the evidence." *Kilpatrick*, 732 So. 2d 876, 880 (¶15). Without those findings, this Court is unable to determine whether the chancellor met the standards of equitable distribution in accordance

15

with *Ferguson*. Therefore, we reverse and remand on this issue for the chancellor to consider and apply those guidelines before dividing the marital property.

### 4. Alimony

¶41. W.B. also contends that the chancery court erred in awarding Magnolia alimony. "Ordinarily, the reversal of a [chancery court's] division of marital property requires reversal of an alimony award." *Hearn v. Hearn*, 191 So. 3d 129, 133 (¶17) (Miss. Ct. App. 2016). This is because "[a]limony and equitable distribution are distinct concepts, but together they command the entire field of financial settlement of divorce . . . . [W]here one expands, the other must recede." *Segree v. Segree*, 46 So. 3d 861, 866 (¶13) (Miss. Ct. App. 2010). Therefore, "when a case is remanded for further consideration of the division of the marital assets, this Court must also remand on the issue of alimony as the proper distribution of the parties' assets and debts may affect the amount of alimony ultimately awarded." *Id.* Because we reverse and remand the chancellor's equitable distribution of the marital estate, we also reverse Magnolia's alimony award and remand this case to the chancellor for further consideration on these issues.

### CONCLUSION

¶42. The chancery court did not abuse its discretion in awarding Magnolia a divorce on the ground of adultery. Nor did the chancery court err in its determination of the point of demarcation. However, the chancery court did err in its distribution of the marital estate by failing to value the marital assets and properly consider the *Ferguson* factors. Accordingly, we affirm the chancery court's grant of divorce and reverse the chancery court's judgment

16

as to the equitable distribution and alimony and remand for proceedings consistent with this opinion.

¶43. **AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD AND McCARTY, JJ., CONCUR.**