# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2007-CA-01988-SCT

*PERRIN H. LOWREY*

*v.*

*CYNTHIA NELSON LOWREY*

| | |
|---|---|
| DATE OF JUDGMENT: | 09/06/2007 |
| TRIAL JUDGE: | HON. JAMES H. C. THOMAS, JR. |
| COURT FROM WHICH APPEALED: | LAMAR COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | THOMAS T. BUCHANAN |
| ATTORNEYS FOR APPELLEE: | WILLIAM MATTHEW THOMPSON |
| | MARK A. CHINN |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | ON DIRECT APPEAL: AFFIRMED IN PART; REVERSED AND RENDERED IN PART; REVERSED AND REMANDED IN PART. |
| | ON CROSS-APPEAL: AFFIRMED - 11/05/2009 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**RANDOLPH, JUSTICE, FOR THE COURT:**

¶1.     Cynthia and Perrin Lowrey were married in 1983, separated in June 2002, and divorced in September 2002.  Their union resulted in three daughters, Brittny, born in 1987, and twins, Erin and Emelie, born in 1991.  Perrin was a schoolteacher and administrator in the Hattiesburg Public School District from 1975 until his retirement post-divorce.  Cynthia was working at Winn-Dixie/Save Rite when the 2007 trial was held.  In September 2002, a

final judgment of divorce was entered. In March 2003, Cynthia moved for relief from that judgment, claiming that she had been overreached, and that the property settlement she had agreed to was inequitable. Her motion was overruled. Cynthia appealed. *See Lowrey v. Lowrey*, 919 So. 2d 1112 (Miss. Ct. App. 2005) ("*Lowrey I*"). The Court of Appeals affirmed the divorce, but reversed and remanded for further proceedings. *Id.* at 1119, 1122. The Court of Appeals held that Cynthia had been overreached, relying on a dubious proffer,[1] and found that the property settlement was inadequate and unfair. *Id.* at 1122. The case was remanded "with instructions to resolve the unresolved matters of child custody, child visitation, child support, property division, and alimony . . . ." *Id.* On remand, a different chancellor held hearings, issued limited findings of fact and conclusions of law, and entered a Judgment of Custody, Visitation, Support and Equitable Distribution of Marital Property.

¶2.     The judgment ordered: (1) paramount[2] physical custody of the three children to Perrin; (2) joint legal custody; (3) visitation for Emelie, Erin, and Brittny; (4) child support in the amount of $200 per month to be paid by Cynthia; (5) *periodic* alimony for Cynthia of $900 per month derived from the division of a marital asset, Perrin's retirement account; and (6) division of home equity and personalty. From that judgment, with the exception of visitation, Perrin appeals and Cynthia cross-appeals.

## ISSUES

¶3.     The issues as filed by Perrin were:

---

[1]The proffer was soundly overcome at trial.

[2]The word "paramount" indicates a ranking or degree of custody. Thus, it has no significance here; Cynthia was not granted physical custody.

2

1.  THE CHANCERY COURT ERRED AS A MATTER OF LAW IN ITS FAILURE TO CONDUCT A PROPER *FERGUSON* ANALYSIS AND COMMITTED MANIFEST ERROR IN ITS FAILURE TO PROPERLY ACCOUNT FOR THE WASTE OF MARITAL ASSETS BY CYNTHIA LOWREY.

2.  THE CHANCERY COURT ERRED AS A MATTER OF LAW AND COMMITTED MANIFEST ERROR IN ITS AWARD OF ALIMONY, FAILURE [TO] MAKE A PROPER *ARMSTRONG* ANALYSIS AND THE USE OF A FORMULA FOR AN AWARD OF ALIMONY WHICH IS UNSUPPORTED BY ANY SUBSTANTIAL, CREDIBLE EVIDENCE.

3.  THE CHANCERY COURT ERRED AS A MATTER OF LAW AND FACT IN ITS CALCULATION OF CHILD SUPPORT.

4.  THE DECISION OF THE CHANCERY COURT GRANTING THE PARTIES JOINT LEGAL CUSTODY OF THE MINOR CHILDREN IS NOT SUPPORTED BY SUBSTANTIAL CREDIBLE EVIDENCE.

5.  THE CHANCERY COURT ERRED AS A MATTER OF LAW AND ABUSED ITS DISCRETION WHEN IT DID NOT PROVIDE SPECIFIC FINDINGS OF FACT AND CONCLUSIONS OF LAW AS REQUESTED BY PERRIN.

¶4.  Cynthia's issues on cross-appeal were:

1.  THE CHANCERY COURT ERRED IN FINDING DISSIPATION OF ASSETS (MARITAL WASTE) WHEN THE EVIDENCE PROVED NONE.

2.  THE ALIMONY AWARD SHOULD BE REVIEWED IN LIGHT OF THE ERRONEOUS FINDING OF MARITAL WASTE.

3.  PRIMARY PHYSICAL CUSTODY TO PERRIN WAS ERROR LEADING TO ERROR IN CHILD SUPPORT.

## SUMMARY OF ARGUMENT

¶5.  Perrin contends, *inter alia*, the following:

The . . . overriding issue involved in each issue . . . is whether a person who refuses to exercise any kind of personal responsibility and engages in

3

destructive behavior – toward themselves, their family, or their children – should be awarded relief by a Chancery Court at the expense of others who do not engage in such behavior and whether or not the innocent parties should be penalized further for such behavior.

In this case Cynthia Lowrey had a gambling addiction so severe that it alienated her from her husband and children, destroyed her relationship with her family and wiped out all of the assets of the parties that were accumulated during the marriage, as well as separate assets of Perrin Lowrey from before the marriage.

. . .

The Chancery Court [then] invented its own formula to award alimony to a person who is employed, has a record of squandering every penny she has ever had on gambling, rather than on her children, and the Chancery Court failed to properly consider the *Armstrong* factors in its award of alimony.

¶6.     Cynthia contends, *inter alia*, the following:

The finding of marital waste was improper . . . . This "waste" was subtracted from the amounts Cindy would have received and impacted, negatively her equitable distribution in excess of $122,000. . . . The Physical Child Custody award to Perrin was not in the best interest of the children. . . . The children need their mother just as Cindy needs a relationship with her daughters. Since there was error in the physical custody . . . there is likewise error in an award of child support.

. . .

[I]n the event the physical custody award is upheld then the support award would be proper and consistent with the proof presented and warranted in light of the circumstance[s] specific to this case.

. . .

[A] Trial Exhibit demonstrated that $122,440.00 in checks were written to casinos out of Cynthia's personal checking account between February 2000 and June 2002. This same amount $122,000 was charged to her by the Chancellor as dissipated assets.

. . .

Both Cynthia and Perrin contributed to the stability and harmony of the marriage until 1995, when problems began.

## DISCUSSION

¶7.     We fully recognize that chancellors are overburdened, and that many cases are tried

"piecemeal." Hearings can be, and often are, separated by weeks or even months, as

4

occurred in this proceeding. Chancellors are required to follow the testimony of witnesses, review documents offered as exhibits, and attempt to make contemporaneous notes. Trial judges are not afforded the advantage of appellate courts to review the full record of a case without interruption. Recognition of these impediments is partially responsible for the development of our rules and caselaw requiring findings of fact and conclusions of law that analyze certain factors. Our rules provide parties the right to request chancellors to make specific findings of fact and conclusions of law. Factor tests, such as provided in *Ferguson* for property division and *Armstrong* for alimony, must be considered on the record in every case. *See Ferguson v. Ferguson*, 639 So. 2d 921, 928 (Miss. 1994); *Armstrong v. Armstrong*, 618 So. 2d 1278, 1280 (Miss. 1993). These factor considerations are not only essential for appellate purposes, but also for trial courts, as they provide a checklist to assist in the accuracy of their rulings. Following these guidelines reduces unintended errors that may affect the court's ultimate decision. The absence of an analysis of these factors and failure to apply the law to the facts at hand create error. Failure to make an on-the-record *Armstrong* analysis is manifest error. *See Henderson v. Henderson*, 703 So. 2d 262, 266 (Miss. 1997); *Armstrong*, 618 So. 2d at 1280.

¶8. The minimal findings of fact and conclusions of law regarding equitable division resulting in alimony include findings without support in the record, fail to identify which factors the chancellor considered to be worthy of consideration *vel non* and, finally, fail to assign weight to the factors considered.

5

¶9. The trial court erred in awarding *periodic* alimony[3] payments from marital assets established as of 2002, relying on events occurring after the date of divorce. Based on a 2006 hearing and the 2007 trial testimony of Cynthia and her psychologist, the chancellor found that Cynthia suffered from physical and emotional ailments, although the psychologist never reviewed Cynthia's medical records, and no physicians testified. The court failed to compel Cynthia to produce medical records (after proper demand) for examination and verification in discovery or use at trial. The resolution date for the division of marital property should be, at the latest, the date of divorce, September 2002.

¶10. As the appropriate ***Ferguson*** and ***Armstrong*** tests were not set out and applied, combined with numerous other errors, we vacate the judgments of the chancellor for equitable distribution of marital assets, resulting in a lump-sum award of alimony, albeit called periodic, and the separate monetary award of $13,250 for equitable interest in the marital home and personalty, and remand for proceedings consistent with this opinion. The chancellor shall enter separate findings of fact and conclusions of law considering every applicable factor required by our precedent. *See **Ferguson***, 639 So. 2d at 928; ***Armstrong***, 618 So. 2d at 1280.

¶11. Regarding child custody, the best interest of the child is the polestar factor. *See **Albright v. Albright***, 437 So. 2d 1003, 1005 (Miss. 1983). We find that the chancellor

---

[3]This was a misnomer. In cases where an award is warranted, the correct term is lump sum alimony paid over time. *See **West v. West***, 891 So. 2d 203, 212 (Miss. 2004); Deborah H. Bell, Bell on Mississippi Family Law §§ 9.02[2], 9.02[2]f (1st ed. 2005) ("Lump sum alimony is a fixed, certain sum . . . . Payment in installments does not alter the characteristics . . . ."). *See also **Devore v. Devore***, 725 So. 2d 193, 198 (Miss. 1998); ***Smith v. Smith***, 614 So. 2d 394, 397-98 (Miss. 1993); ***East v. East***, 775 So. 2d 741, 745 (Miss. Ct. App. 2000).

performed an *Albright* analysis, and that there is substantial evidence to support the chancellor's decision to award Perrin physical custody. *See id.* However, regarding legal custody, we find that the chancellor applied an erroneous legal standard in granting joint legal custody. We reverse the chancery court and render judgment granting Perrin legal custody, in conformity with the chancellor's findings of fact, per *Albright.* *See id.*

¶12. Regarding child support, we find that the chancellor deviated from the statutory guidelines without providing a legally-sufficient reason for doing so. *See* Miss. Code Ann. § 43-19-101 (Rev. 2004). Thus, we reverse and remand this issue for consideration by the chancellor consistent with this opinion.

## BACKGROUND

¶13. The marriage came to an abrupt end when in June 2002, Cynthia revealed not only that her severe gambling problem had wiped out the family's assets, but that she had incurred massive debt. The unraveling of the marriage paralleled the time when Cynthia began work outside the home. Initially, Cynthia was a stay-at-home mother. In 1993, she began working outside the home at a grocery store on weekend nights. She later worked as a cashier, bookkeeper, and business manager. She admitted that, after work, she routinely stayed out most of the night with friends, and that, when she went home, she slept on the living-room sofa until late in the day. She took over the family's living room as her bedroom. Perrin testified that, when he came home from work on Fridays, Cynthia would leave. He took care of the children until Monday morning. He further testified that Cynthia went out weeknights as well, three to four times per week. Cynthia admitted that, on several mornings each week, she slept while the children got ready for school. Brittny, who was twenty at the

7

time of the trial, testified that the rest of the family had to be careful not to wake Cynthia as they got up and prepared to go out for the day. Brittny testified that this arrangement existed as far back as she could remember, and continued until Cynthia moved out of the house in 2002. Brittny testified that her father was always the primary caregiver. Cynthia's former church pastor testified about the family relationship, but he had visited the Lowrey home only three to four times and could not offer an opinion on who had been the primary caregiver. Cynthia testified that, after she began to work full-time at a florist, she continued to stay out late at night and sleep late on the sofa. Although Cynthia told her family she was working late, her former employer testified that she was rarely required to work late, and not several times a week as Cynthia claimed. She was never required to work through the night, except the holidays of Mother's Day and Valentine's Day.

¶14. Perrin testified that, in 1995 or 1996, Cynthia confessed to him that she had been gambling excessively and had incurred a credit-card debt of approximately $12,000-14,000 that she could not pay back. The indebtedness had been charged to an AT&T card and other credit cards that Perrin had not known about previously. Perrin had not used the credit cards. He testified that he had not used any credit card since 1991. Perrin testified that Cynthia agreed at that time to stop gambling, and that they cut up the credit cards. He began to pay off the AT&T debt over time, and paid off the other cards in full, using $2,000 from his savings and $15,000 he had received from his grandmother's estate.

¶15. Cynthia continued to gamble, unbeknownst to her family. She testified that the gambling increased markedly in 2000. She admitted that in 2001, she asked Perrin to take out a $30,000 home-equity account to pay off the AT&T credit-card balance, with the

8

remainder to be used to remodel their house. However, no such remodeling occurred. The records of the home-equity account reveal that Cynthia withdrew $34,700 in less than a year (July 2001 - June 2002). Perrin never made a withdrawal. He testified that he kept the account current by paying at least the minimum amount (ranging from $491 to $599) each month. The monthly payments totaled approximately $7,000. The monthly finance charges ranged from $97 up to $168.[4]

¶16. Cynthia acknowledged that her gambling addiction had destroyed the marriage. She admitted that she was driving alone to casinos late at night. The records of her checking account for a limited period reveal that she wrote 380 checks to various casinos, totaling approximately $122,000, during a twenty-eight-month period from February 2000 until June 2002. She admitted that each check represented a separate round trip from their home in Hattiesburg to the coast casinos. Cynthia further admitted, and Brittny confirmed, that Cynthia had Brittny intercept and hide bank statements to prevent Perrin from discovering her gambling. The record reveals a later address change on the monthly statements for the home-equity account from their home address to her business address. The checking account stayed technically "in the black," as the Lowreys' savings account was automatically charged when a check was drawn on insufficient funds. These savings-to-checking transfers totaled an additional $4,841. In addition to the direct checks to the casinos, other checks included

[4]After the separation in 2002, Perrin paid off the home-equity account, as well the AT&T credit-card account (which had increased again by virtue of cash advances to Cynthia), using the proceeds of a loan from his sister. That loan was in the amount of $42,000, which he began to repay at $684 per month while continuing to pay the home mortgage at $725 monthly. In 2003, Perrin consolidated these debts by borrowing enough to pay off the private loan in full. He then began paying $961 per month to the bank, with the last payment due in 2013.

$8,760 for "Cash"; $29,400 for "Credit Payments" (cash-advance repayments); and $1,300 for "Other." The checking account records, Cynthia's admissions regarding gambling losses, and her failure to offer any reason other than gambling for the dissipation of these funds offer irrefutable evidence of wasteful dissipation and of her broken promise to Perrin to stop gambling and using credit cards. Cynthia testified that she went to the children, and told them she "had wasted a lot of money." The records reveal payments of $19,521 were used to pay the house note. However, the testimony confirmed by the records revealed that Perrin deposited $1,500 per month into this account.[5] Over the same twenty-eight months, a paucity of funds was spent on her family, $3,080: "Grocery" ($1,190), "Department Store" ($963), and "Children/Home" ($927).

¶17. Cynthia admitted that she had forged Perrin's name on credit-card applications and had the bills sent to her work address. She admitted that she was using seven credit cards at that time in 2002 ("The A.T.&T. card . . . . Capitol One, Bank of America, First of America, McRae's, Sears, First U.S.A. Bank . . . ."). She admitted that she did not tell Perrin about these accounts until after she had lost her job at the florist, and after her employer had informed her that he was going to tell Perrin. Her employer testified that she had received bills at the work address. He also testified that Cynthia had the authority to write checks on his business to pay business expenses, but that she wrote checks to herself, which his wife discovered while he was in the hospital in 2002. He returned to work to find his business account was overdrawn, fired Cynthia and threatened to tell Perrin about her gambling and the credit cards.

---

[5]$1,500 times twenty-eight months equals $42,000.

10

¶18.    At that time, Cynthia confessed to Perrin that her gambling had created excessive debt.  That same night, Cynthia visited the Lowreys' pastor.  The next morning, Perrin and Cynthia met with the pastor for less than two hours.  They discussed the possibility of counseling, but Perrin stated that he needed to determine the severity of the problems.  When Perrin realized the extent of the dilemma, he told Cynthia that he wanted a divorce.  In July 2002, Perrin and Cynthia filed a joint divorce complaint, which included a property settlement agreement.

¶19.    In a temporary-support hearing in 2006, at which no cross-examination was allowed, she claimed that, in the four years following the divorce, she had been living in her car most of the time – living, as the chancellor described it, "a spartan existence."  However, at trial in 2007, she testified that she had leased an apartment immediately upon separation and had lived there for more than a year.  She was evicted from that apartment approximately eighteen months later because she failed to pay the rent.  She then moved into another apartment, but eventually fell behind on the rent there as well.  She further admitted that she had lived for more than a year in a home with members of her church.  The church member, who owned the home, testified that she had lived there for eighteen months, buying some groceries and paying a portion of the utility expenses, for an estimated contribution of $300-400 per month.  He stated that he did not know that she had disposable income of approximately $2,300 per month during this time.  His testimony conflicted with Cynthia's, for he testified that she had voluntarily moved out during the Fourth-of-July weekend in 2007 (two weeks before trial), and that she was welcome to return.  The chancellor recognized that Cynthia's living arrangements had been her own decision, stating that "just prior to trial [she]

11

chose to live her nights in a combination of alternating one night in her automobile and one night in [a] hotel . . . ." Although she admitted to a gambling relapse after her children stopped seeing her in 2003, Cynthia testified that she had not gambled in four years, and no longer had the desire to do so. However, another member of her church contradicted this testimony. He testified that he and his wife had seen Cynthia gambling at a slot machine in a Biloxi casino on a Friday night in July 2006, only three months prior to the October 2006 hearing.

¶20. Cynthia's pay stubs reveal that she was working full time and had health-insurance coverage. She admitted that, right after the separation, she got a job. She testified that when she left that job, she already had a job at Winn-Dixie/Save Rite, where she remained employed during the 2007 trial. At trial, she testified that her pay rate was $9.29 per hour.[6] Her 2007 financial statement ("8.05 statement")[7] asserted a monthly net income of $1,947, which included $750 in temporary support that had been ordered by the chancellor, based on her 2006 testimony. One of her 8.05 statements included a deduction of a $320-per-month garnishment on a BancorpSouth judgment that had been paid off before trial, and payment of a house note that she had not paid since the separation in 2002. She further testified that

---

[6]Her weekly paycheck stub for July 5-11, 2007, revealed that, roughly halfway through the year, she had been paid for more than 1,000 hours of work, and that her hourly wage was 9.94 per hour. It further revealed that she had taken only 28.5 hours of sick leave since January 2007.

[7]"Unless excused by Order of the Court for good cause shown," a financial statement is required "in every domestic case involving economic issues and/or property division . . . ." Miss. Unif. Chanc. R. 8.05.

the furnishings she selected to take from the marital home in 2002 were kept in a rented storage unit. The 8.05 statements showed a deduction for that rental expense.

¶21. Perrin testified that, less than a week after the separation, he began to receive collection calls concerning the credit-card accounts Cynthia fraudulently had opened in his name. Eventually, he was able to get this debt forgiven. He received additional compensation in the settlement of these disputes. These charge-offs and post-divorce settlements did not reduce other debts he was required to pay during the marriage or the debts that he was saddled with after the separation and divorce.

¶22. Perrin remained responsible for the home mortgage, the home-equity line of credit, and the AT&T credit card. After the separation, with his own funds and a $42,000 loan from his sister, he paid off the bank on the home-equity account balance of approximately $30,000, as well as the AT&T credit-card balance of $13,900. Afterward, he paid $684 per month on the loan, while continuing to pay the first mortgage of $725 per month.

¶23. The chancellor found Perrin's 2007 earning capacity and actual earnings were more than those of Cynthia, however, the findings of fact fail to address his expenses in maintaining the home for himself and their three daughters, raising three children (one in college), and repayment of debts not of his making. At the time of the divorce, no finding was made regarding his claimed negative net worth, and his claim that his expenses exceeded his income.

¶24. There was no testimony about the medical conditions Cynthia now alleges existed at the time of separation and divorce, save for a gambling addiction. Cynthia admitted this addiction had destroyed the family and resulted in the separation and divorce, followed by

13

the estrangement of her children. The chancellor found that Cynthia's personality traits had resulted in her addictive behavior and now her despair and anxiety.

ANALYSIS

¶25. Issues one, two, and five, as submitted by Perrin, are combined for discussion.

### I. Equitable Division

¶26. "'A chancellor's findings of fact will not be disturbed unless manifestly wrong or clearly erroneous.'" *Sanderson v. Sanderson*, 824 So. 2d 623, 625 (Miss. 2002) (quoting *Consol. Pipe & Supply Co. v. Colter*, 735 So. 2d 958, 961 (Miss. 1999)). "However, the Court will not hesitate to reverse if it finds the chancellor's decision is manifestly wrong, or that the court applied an erroneous legal standard." *Owen v. Owen*, 928 So. 2d 156, 160 (Miss. 2006). A chancellor's conclusions of law are reviewed de novo. *Chesney v. Chesney*, 910 So. 2d 1057, 1060 (Miss. 2005) (citing *Southerland v. Southerland*, 875 So. 2d 204, 206 (Miss. 2004)). The distribution of marital assets in a divorce will be affirmed if "'it is supported by substantial credible evidence.'" *Bowen v. Bowen*, 982 So. 2d 385, 393-394 (Miss. 2008) (quoting *Owen*, 928 So. 2d at 160). A chancellor is required to make findings of fact regarding all applicable *Ferguson* factors. *See Kilpatrick v. Kilpatrick*, 732 So. 2d 876, 881 (Miss. 1999); *Ferguson*, 639 So. 2d at 928. "[M]arital misconduct is a viable factor entitled to be given weight by the chancellor when the misconduct places a burden on the stability and harmony of the marital and family relationship." *Carrow v. Carrow*, 642 So. 2d 901, 904-05 (Miss. 1994). *See also Brabham v. Brabham*, 950 So. 2d 1098, 1101-02 (Miss. Ct. App. 2007). "[A]n equitable division of property does not necessarily mean an equal division of property." *Chamblee v. Chamblee*, 637 So. 2d 850, 863-64 (Miss. 1994).

"[F]airness is the prevailing guideline in marital division." *Ferguson*, 639 So. 2d at 929. Here, the chancellor made findings of fact without support in the record and failed to identify the specific factors and weights given the limited factors interspersed in the opinion. He also failed to explain why certain factors were deemed inapplicable. The chancellor correctly found wasteful dissipation, but the amount the chancellor found is not supported by substantial evidence, resulting in manifest error, as revealed in the record before this Court. Additionally, there is no evidence that the market value of the retirement account at the time of the divorce was considered, although that evidence was admitted.

¶27. For purposes of determination of equitable division in this case, the date for determination would be either the date of separation (at the earliest) or the date of divorce (at the latest). "Cases appear to hold that, as a matter of law, property acquired during separation is marital unless a support order has been entered. . . . However, a few cases suggest that the issue is a question of fact for the chancellor to decide . . . ." Bell on Mississippi Family Law at § 6.02[3][b] n.58 (citing *Stone v. Stone*, 824 So. 2d 645, 647-48 (Miss. Ct. App. 2002); *Aron v. Aron*, 832 So. 2d 1257, 1258-59 (Miss. Ct. App. 2002)). Here, the record reveals no acquisition of assets between the two dates (late June and early September of 2002) that would alter that consideration. Thus, there is no legal basis for using a date after the date of divorce, as was done here. We agree that alimony, custody, and child-support proceedings should be determined at the time of hearing, for the result must consider the *Armstrong* factors for alimony and the *Albright* factors for custody at that time, and the chancellor also is required to take into consideration the statutory guidelines and exceptions regarding child support. *See Armstrong*, 618 So. 2d at 1280; *Albright*, 437 So.

15

2d at 1005; Miss. Code Ann. §§ 43-19-101, 43-19-103 (Rev. 2004). *See also Rainer v. Rainer*, 393 So. 2d 475, 477-78 (Miss. 1981); *McKay v. McKay*, 312 So. 2d 12, 14 (Miss. 1975).

¶28. *Ferguson* requires consideration of the following factors, or a finding of inapplicability:

> 1. Substantial contribution to the accumulation of the property. Factors to be considered in determining contribution are as follows:
>
>> a. Direct or indirect economic contribution to the acquisition of the property;
>>
>> b. Contribution to the stability and harmony of the marital and family relationships as measured by quality, quantity of time spent on family duties and duration of the marriage; and
>>
>> c. Contribution to the education, training or other accomplishment bearing on the earning power of the spouse accumulating the assets.
>
> 2. The degree to which each spouse has expended, withdrawn or otherwise disposed of marital assets and any prior distribution of such assets by agreement, decree or otherwise.
>
> 3. The market value and the emotional value of the assets subject to distribution.
>
> 4. The value of assets not ordinarily, absent equitable factors to the contrary, subject to such distribution, such as property brought to the marriage by the parties and property acquired by inheritance or inter vivos gift by or to an individual spouse;
>
> 5. Tax and other economic consequences, and contractual or legal consequences to third parties, of the proposed distribution;
>
> 6. The extent to which property division may, with equity to both parties, be utilized to eliminate periodic payments and other potential sources of future friction between the parties;

7. The needs of the parties for financial security with due regard to the combination of assets, income and earning capacity; and,

8. Any other factor which in equity should be considered.

*Ferguson*, 639 So. 2d at 928.

¶29. The failure to consider all applicable ***Ferguson*** factors is error and mandates reversal. *See **id.*** Thus, we reverse the judgment as to equitable distribution of marital property because the judgment failed: (1) to consider the market value of Perrin's retirement account, (2) to calculate the correct amount of wasteful dissipation, and (3) to credit Perrin for the marital and nonmarital assets that he expended, or was committed to expend, before the date of divorce.

¶30. In the first line of the analysis of the equitable division, the chancellor found that each party should get a "fair share" of the accumulated assets. The holding essentially finds that the marital assets should be split, but that Cynthia's presumed share should receive deduction, because she "should pay her gambling debts." The resulting division failed on both counts. It did not require Cynthia to pay the full amount of debt. The division grossly overcompensated Cynthia by engaging in a speculative analysis of a purported future income stream generated by the retirement benefits Perrin might receive during his purported life expectancy. His life expectancy was not presented for evidence, nor does the record reveal that the court took judicial notice of same. Finally, the analysis failed to reduce the purported future income stream to present net value, before deductions.

¶31. Without analysis of factor one, and an erroneous analysis of factor two, the court granted Cynthia forty percent of Perrin's retirement benefits earned during the marriage.

17

*Ferguson* factor 1(b) ("Contribution to the stability and harmony of the marital and family relationships as measured by quality, quantity of time spent on family duties . . . .") is particularly applicable here. *Id.* All can agree that a homemaker's contribution is presumed to be equal to that of a wage-earner. *See Hemsley v. Hemsley*, 639 So. 2d 909, 915 (Miss. 1994) ("We assume for divorce purposes that the contributions and efforts of the marital partners, whether economic, domestic or otherwise are of equal value."). However, we find that the *Hemsley* presumption must be measured against the *Ferguson* standard, the "contribution to the economic and emotional well-being of the family unit." *Ferguson*, 639 So. 2d at 929 (citing *LaRue v. LaRue*, 304 S.E.2d 312, 322-23 (W.Va. 1983) (superseded by statute creating a right to equitable distribution)). In a separate opinion, two justices agreed with the *Ferguson* majority that "no *'per se'* material contribution arises by virtue of the mere existence of a marriage . . . ." *Ferguson,* 639 So. 2d at 938 (Lee, P.J., concurring in part and dissenting in part) (emphasis in original). *LaRue*, which was cited extensively in *Ferguson*, stated the following:

> the concept of homemaker services . . . rests on a showing that the homemaker has contributed to the economic well-being of the family unit through the performance of the myriad of household and child-rearing tasks . . . . In valuing this service . . . consideration should be given to the quality of the services. For example, a homemaker who, over the course of the marriage, has been frugal in the handling of homemaker expenditures and has thereby enhanced the family assets is entitled to a more equitable return than one who has been extravagant.

*LaRue*, 304 S.E.2d at 322-23. By her own admission, for years preceding the separation, Cynthia was a prodigious gambler. She offered no evidence to contradict other witnesses who testified that she had not contributed to the stability of the marriage since 1995, whether

18

measured by quality or quantity of time. There is evidence that, early in the marriage, Cynthia contributed both as a homemaker and a wage-earner, but there is no credible evidence that she contributed to the family's needs or to the stability and harmony of the marriage since 1995. *See* Appellee's brief at 8. The record clearly reveals that in the 2000-2002 time frame, the majority of her time was devoted to gambling, as well as wasting family assets.[8] Whether the chancellor took her lack of contribution to the family into account in assigning her share is not available for appellate review, as he did not provide any findings of fact or conclusions of law regarding this.

¶32. The chancellor did make a finding of fact regarding disposal of marital assets, but substantial evidence does not support the totality of the wasteful dissipation. Factor three ("market value") was not considered by the chancellor, although evidence of the market value of the retirement account was admitted into evidence. *See **Ferguson***, 639 So. 2d at 928. Rather than consider that evidence, the chancellor conjured an erroneous future income stream based on Perrin's post-divorce retirement, which the chancellor estimated would pay out more than $1.3 million, assuming a twenty-three-year life expectancy. The findings of fact failed to address factor four ("property brought to the marriage by the parties and property acquired by inheritance . . ."), even though both parties received inheritance money during the marriage. *Id.* Perrin testified that assets he brought into the marriage were

---

[8]Brittny testified that her mother had monthly yard sales, which included new items belonging to the children. "She'd go through our rooms and take new stuff. . . . And we would have to go out, and we'd take back the stuff that we wanted when she wasn't looking, because she would just pretty much empty out our rooms and take all of our clothes and toys and anything she could get her hands on." Brittny also testified that when the children gave their mother a gift, she would take it back to the store and exchange it for cash.

dissipated. It is uncontested that Perrin had savings of $45,000 prior to the marriage ($20,000 from his father's estate and $25,000 from the sale of a business). During the marriage, he received an inheritance of $15,000 from his grandmother's estate. Cynthia received a $10,000 (undisclosed to Perrin) inheritance. The findings of fact fail to address factor five ("Tax and other economic consequences . . . of the proposed distribution") even though: (1) alimony was ordered (a deduction for Perrin and taxable income for Cynthia); and (2) the debt-repayment obligation upon Perrin has tax consequences and other economic consequences. *Id.* *See* 26 U.S.C. §§ 71(a), 163(h)(3)(A), 215(a) (2008). The findings of fact addressed factor six without citing it explicitly. Factors seven and eight ("needs," and "[a]ny other factor which in equity should be considered") were discussed. *Id.*

¶33. The chancellor found that two of the factors, Cynthia's dissipation (both a *Ferguson* and an *Armstrong* factor) and her 2007 needs (an *Armstrong* factor by date), offset each other (based on her dubious testimony and her 8.05 statements, which also were contradicted by her testimony and other exhibits).[9] *See id.*; *Armstrong*, 618 So. 2d at 1280. Such an analysis is doubly in error. Cynthia's dissipation was miscalculated, and the wrong dates were considered. "[M]arital property accumulation continues until divorce." Bell on Mississippi Family Law at § 6.02[3][b].

**A. Wasteful dissipation**

¶34. We find no fault in the chancellor's finding that Cynthia dissipated assets due to her gambling addiction. Thus, Cynthia's contention that there was no dissipation is without

---

[9]Her 8.05 statement does not reflect the rent for the apartment in 2002, misstates her income, and takes deduction for a paid-off garnishment, *inter alia*.

merit. This Court has held that gambling losses can be considered as dissipation in an equitable distribution of marital assets.[10] *See Craft v. Craft*, 825 So. 2d 605, 607, 611 (husband had net gambling losses of $67,000 over a three-to-four-year period). However, the amount of wasteful dissipation charged to Cynthia in the findings of fact, $122,000, significantly understates the amount dissipated and the timing of the waste. The findings state, "[Cynthia] ultimately expended assets, including marital assets, over a period of time resulting in approximately $122,000 in debt at the time of separation resulting from gambling from 1995 until 2002." This finding fails to consider the totality of the dissipation amount, mischaracterizes the erroneous amount as debt, and errs as to the time period. Bank records entered as evidence reveal that Cynthia wrote $122,400 in checks to various coastal casinos from February 2000 until June 2002.

¶35. The finding fails to consider other substantial evidence available from the same bank records covering the same twenty-eight-month period. Cynthia wrote $8,760 in checks for cash from the account. The same records revealed she wrote checks on insufficient funds on numerous occasions, causing $4,841 to be transferred out of the couple's savings account. She misspent nearly $35,000 from the home-equity account and ran the AT&T credit card up to a balance of $13,900. Payments from the checking account to pay credit-card advances totaled an additional $29,400. Perrin was paying and continues to repay some of the debts through repayments on the consolidated loan from Trustmark. Perrin testified that she also depleted their savings account and took other money from their daughters' college fund.

---

[10]Gambling losses are not *per se* dissipation. This is to be decided on a case-by-case basis.

¶36. The finding that Perrin's actions caused his wife's gambling problem is not supported by substantial evidence. The only evidence offered connecting Perrin to gambling was that Perrin took Cynthia and their daughters to a work-related convention on the coast once a year. While on these trips, Perrin and Cynthia gambled between $50 and $100. There was no evidence that Perrin gambled at any other time or encouraged Cynthia to gamble. No evidence exists for the conclusion that these trips "brought on a condition of addiction," or that Perrin "must feel some responsibility in initiating the gambling activities . . . ," as no witness for either party, expert or lay, offered such evidence. The finding that Cynthia first informed Perrin of her gambling problem in 2001 is not in the record. Substantial evidence, whether testamentary or documentary, supports no other conclusion than that the depletion of marital assets was due to Cynthia's excessive gambling, and not by any action of Perrin.

¶37. The chancellor found that Perrin substantially had contributed to the appreciation of the marital estate and should be credited for the heavy financial burden of repaying those debts incurred by Cynthia. However, if Perrin received credit for his efforts, it was in words only, for no calculation of credit can be discerned in the findings of fact and conclusions of law, or in the judgment. None of the debt repayment that Perrin had to make, or committed to make, during the marriage was credited. The findings of fact make no mention of Perrin's paying off the debts Cynthia created, except to mention that Perrin successfully had challenged part of the debt, a benefit that also inured to her.

¶38. Repayment of gambling debts is not the type of domestic purpose in which nonmarital property would become marital when commingled. *See Stewart v. Stewart*, 864 So. 2d 934, 937 (Miss. 2003). In *Stewart*, the nonmarital property was a house that became a marital

22

home when the homeowner remarried. *Id.* at 939. Use of nonmarital assets to pay off debts due to dissipation was not at issue in *Stewart* or in other cases in which the family-use doctrine has been applied.[11] Debts incurred by a spouse pursuing goals other than the general welfare of the marriage are considered separate debt. *See Garriga v. Garriga*, 770 So. 2d 978, 984 (Miss. Ct. App. 2000) (funds used by a spouse to pursue an extramarital relationship were waste, requiring reimbursement to the marital estate). When other spouses have been found to have dissipated assets, the Court of Appeals has not been nearly so understanding of the dissipator's "needs" as the chancellor has been here. *See Brabham*, 950 So. 2d at 1101 (order granting wife ten percent of the value of husband's retirement account upheld because of wife's behavior, including diversion of marital assets, infidelity, and lack of financial or domestic contribution, which caused the termination of the marriage); *King v. King*, 946 So. 2d 395, 404 (Miss. Ct. App. 2006) (wife received the entire marital estate because of husband's dissipation); *Wolfe v. Wolfe*, 766 So. 2d 123, 129 (Miss. Ct. App. 2000) (wife received the marital home because amount of husband's dissipation equaled his share of the home equity).

¶39.    Perhaps most illustrative of appropriate resolution of dissipation can be found in *Dunaway v. Dunaway*, 749 So. 2d 1112 (Miss. Ct. App. 1999). In *Dunaway*, the Court of Appeals found that the awarding of one-hundred-percent asset value of a husband's

---

[11]*See Singley v. Singley*, 846 So. 2d 1004, 1011 (Miss. 2002) (nonmarital assets used to purchase a marital home); *Bullock v. Bullock*, 699 So. 2d 1205, 1211 (Miss. 1997) (nonmarital assets used to purchase a marital home); *Johnson v. Johnson*, 650 So. 2d 1281, 1286 (Miss. 1994) (timber-sale proceeds used to benefit entire family).

dissipation to the wife resulted in an excessive award. *Id.* at 1119. The ***Dunaway*** court cut in half a portion of the wife's award.[12] *Id.* The court used the following analysis:

> [W]e are nevertheless left with the conclusion that, to the extent the chancellor awarded to Mrs. Dunaway one hundred percent of those marital assets improperly dissipated by Mr. Dunaway, the award took on something of a punitive aspect. This is especially true in view of the chancellor's apparent overall intention to make a roughly equal division of marital assets. Recognizing that this roughly equal division was the chancellor's goal, we observe that, had Mr. Dunaway not dissipated those assets in the manner that he did, they would have been in that body of assets to be equally divided, thereby entitling Mr. Dunaway to approximately one-half of them. Though Mr. Dunaway's conduct in disposing of these assets certainly warranted some relief, we conclude that returning to Mrs. Dunaway the one-half that was rightfully hers is adequate relief.

*Id.* Unlike the case sub judice, in ***Dunaway***, the amount of dissipation was only a fraction of the total value of the marital estate, which was more than $1,000,000. *See id.* at 1115. Here, the dissipation amount exceeds the value of the marital estate at the time of the divorce (September 2002). Other than the equity in the home ($19,000) and the value of the couple's vehicles ($3,500), and other personalty ($7,500), the only item of value to be considered in the marital estate was Perrin's retirement account. The findings of fact set the market value of the retirement account on the date of divorce at $83,077 in state retirement and $30,182 in deferred compensation. Had the chancellor ordered an equal distribution without consideration of fault or dissipation, and ignored other ***Ferguson*** factors, Cynthia would have received $54,640.65 for a nineteen-year marriage.[13] Even if we were to accept the

---

[12]The $82,000 attributed to the husband's dissipation was reduced to $41,000.

[13]$113,259 times thirty-five percent equals $39,640.65 as her share of the retirement account. Assuming Cynthia were to receive half of the retirement account accrued during the marriage, she would get thirty-five percent of the total in the retirement and one-half of the remaining marital assets of $30,000, i.e. $15,000, for a total of $54,640.65.

erroneous finding of $122,000 dissipation, we observe that, if Cynthia had not dissipated that amount, those assets would have been in the body of assets to be equitably divided. In that event, Cynthia's claim to Perrin's retirement vanishes. She should receive nothing from this account, as she already has spent more than her share. "Fairness and equity are two-way streets . . . ." *O'Neil v. Honeywell, Inc.*, 784 A.2d 428, 434 (Conn. App. Ct. 2001).

¶40. The Court of Appeals followed the *Dunaway* decision with *Childs v. Childs*, 806 So. 2d 273 (Miss. Ct. App. 2000). In *Childs*, one spouse's dissipation was more than twice the value of the marital estate. *Id.* at 275. The court unanimously affirmed the chancellor who had held that the dissipator should receive nothing in the distribution because she had "previously appropriated to herself more than four times what she would have been entitled to receive in equitable distribution." *Id.* Unlike the Court of Appeals, this Court has not had occasion to address a case in which a spouse's wasteful dissipation exceeds what would have been the value of the marital estate absent the wasteful dissipation. We are in accord with the holdings of the Court of Appeals in *Childs* and *Dunaway*. Accordingly, we adopt the rationale expressed therein, as we find it to be logically sound and, at the same time, it honors the tenets of equity. *See Childs*, 806 So. 2d at 275; *Dunaway*, 749 So. 2d at 1119.

## B. Market Value

¶41. The record reveals that Perrin began his career as an educator in 1975, before he married Cynthia in 1983. The separation occurred in June 2002. At the time of the divorce, Perrin was employed, with a gross income of $6,963 per month, netting $4,160. However, the findings of fact consider events occurring post-divorce, i.e., his retirement, after which his income was $4,798. The findings refer to his life expectancy (from sources unknown,

25

as no evidence was introduced) and no judicial knowledge of record is found to support a finding that he would receive $1,324,270 over the next twenty-three years. The court neither analyzed the present net value of the retirement account as of date of divorce, nor considered market value as required by ***Ferguson***. *See Ferguson*, 639 So. 2d at 928. Additionally, the judgment fails to consider factor six of ***Ferguson***, "eliminate periodic payments and other potential sources of future friction between the parties." ***Id.***

¶42. According to the findings of fact and conclusions of law, the market value of the retirement account on the date of divorce was $83,077 in state retirement, and $30,182 set aside in deferred compensation. The chancellor found that seventy percent of total retirement benefits were accumulated during the marriage, but provided no analysis of how this number was derived. Presumably, it was calculated based on nineteen years (1983-2002) of marriage as the numerator, and twenty-seven years (1975-2002) during which Perrin accrued benefits, as the denominator – the result being slightly more than seventy percent. But duration of the marriage is but one element of ***Ferguson*** factor one, for there must also be substantial contribution to the accumulation of property, direct or indirect contribution to the acquisition. *See **id.*** No analysis of the period from February 2000 to June 2002 accompanied the court's findings. It would reveal that, of the $189,000 in deposits to the account, of which Perrin deposited $42,000, Cynthia spent a total of $1,190 on groceries, $963 in department stores, $927 on her children and home, and $19,521 on mortgage payments, without offering any evidence of how the remaining amount was spent.

### C. Award of Periodic Alimony to Accomplish Division of Marital Property

26

¶43.   In the "Equitable Distribution" section of the findings of fact and conclusions of law, the chancellor stated the following:

> As a matter of law the court finds [Cynthia] should be entitled to a portion of [Perrin's] accumulated retirement . . . . The court determines that [Cynthia] is entitled to forty percent of that accumulation . . . in an award to [Cynthia] of $901.43 monthly as her portion of that marital asset, which shall be paid as periodic alimony.

¶44.   "More than any other area of family law, alimony is in a state of transition and uncertainty."  Bell on Mississippi Family Law at 229.  The original purpose was to enforce a husband's duty to support his wife.  *Id.* at § 9.01[1].  It evolved into a "gender-neutral award based primarily on income disparity . . . ."  *Id.* at § 9.01[2].  *See also Orr v. Orr*, 440 U.S. 268, 279-80, 99 S. Ct. 1102, 1112, 59 L. Ed. 2d 306 (1979).  Further, alimony has become a secondary remedy to property division.  *See* Bell on Mississippi Family Law at §§ 9.01[2], 9.01[4][b].  "One of the goals of adopting equitable distribution was to alleviate the need for alimony."  *Id.* at § 9.01[5][d].  Our courts draw a distinction, albeit not a sharp one, between property division and alimony.[14]  The subject of alimony should not be broached unless and until the property division is complete.  *See Lauro*, 847 So. 2d at 848.  Then, it should only be done after applying the *Armstrong* factors, as follows:

> 1. The income and expenses of the parties; 2. The health and earning capacities of the parties; 3. The needs of each party; 4. The obligations and

---

[14]*Townsend v. Townsend*, 859 So. 2d 370, 379 (Miss. 2003) (a division of property was intended, despite a clerical error characterizing the division of retirement benefits as alimony); *Lauro v. Lauro*, 847 So. 2d 843, 848-49 (Miss. 2003) (quoting *LaRue v. LaRue*, 304 S.E.2d 312, 334 (W.Va. 1983)) ("All property division, [and] lump sum or periodic alimony payment . . . should be considered together. 'Alimony and equitable distribution are distinct concepts, but together they command the entire field of financial settlement of divorce. Therefore, where one expands, the other must recede.'").

assets of each party; 5. The length of the marriage; 6. The presence or absence of minor children in the home, which may require that one or both of the parties either pay, or personally provide, child care; 7. The age of the parties; 8. The standard of living of the parties, both during the marriage and at the time of the support determination; 9. The tax consequences of the spousal support order; 10. Fault or misconduct; 11. Wasteful dissipation of assets by either party; or 12. Any other factor deemed by the court to be "just and equitable" in connection with the setting of spousal support.

*Armstrong*, 618 So. 2d at 1280. This Court has stated the following:

> Alimony is considered only after the marital property has been equitably divided and the chancellor determines one spouse has suffered a deficit. "Division of marital assets is now governed under the law as stated in *Hemsley* and *Ferguson*. First, the character of the parties' assets, i.e., marital or non-marital, must be determined pursuant to *Hemsley*. The marital property is then equitably divided, employing the *Ferguson* factors as guidelines, in light of each parties' non-marital property. *Ferguson*, 639 So. 2d at 928. If there are sufficient marital assets which, when equitably divided and considered with each spouse's non-marital assets, will adequately provide for both parties, no more need be done. If the situation is such that an equitable division of marital property, considered with each party's non-marital assets, leaves a deficit for one party, then alimony based on the value of non-marital assets should be considered."

*Lauro*, 847 So. 2d at 848 (quoting *Johnson v. Johnson*, 650 So. 2d 1281, 1287 (Miss. 1994)).

¶45. It is abundantly clear the award of lump-sum alimony, albeit deemed *periodic* alimony, was based on an errant division of marital property. We find ample support in the record that the chancellor was eminently correct in determining that wasteful dissipation occurred. Wasteful dissipation is, by definition, "to indulge in extravagant pursuit of pleasure." Webster's II New College Dictionary 330 (1995). If the chancellor finds on remand that the wasteful dissipation exceeded one-half of the value of the marital estate, no more need be done as to equitable distribution of marital assets.

## II.    Child Support

¶46.    In the area of child support, this Court respects a chancellor's findings of fact if they are supported by credible evidence and not manifestly wrong.  ***R.K. v. J.K.***, 946 So. 2d 764, 772 (Miss. 2007).  Mississippi Code Section 43-19-101(1) (Rev. 2004) provides child-support guidelines that are entitled to a rebuttable presumption of correctness.  *See **Chesney v. Chesney***, 910 So. 2d 1057, 1061 (Miss. 2005).  This Court will not affirm a child-support award that deviates from the statutory guidelines unless the chancellor "overcome[s] the rebuttable presumption . . . by making an on-the-record finding that it would be unjust or inappropriate to apply the guidelines in the instant case."  ***Id.***

¶47.    Perrin argues that the chancellor's child-support award deviates downward from the guidelines, and that the chancellor gave no reason for the deviation.  The chancellor not only deviated from the statutory guidelines, he failed to consider all of Cynthia's income in determining the amount.

¶48.    The "Support" section of the chancellor's findings of fact and conclusions of law follows here, in its entirety:

> [Cynthia] shall pay child support of $200.00 each month, beginning October 1, 2007, to the office of the Chancery Clerk of Lamar County, Mississippi, determined as about fourteen percent of her base income of 1,500.00.  The sooner the parties begin applying the basic principles of responsibility and entitlement, the better.  A positive contribution of [Cynthia] toward the support and welfare of her children should over time, play a part in cementing relationships.

No reason is given for the deviation downward from the statutory guideline that calls for twenty-two percent for three children.  *See* Miss. Code Ann. § 43-19-101 (Rev. 2004).  The

29

findings of fact erroneously calculated Cynthia's income[15] as follows, "She is employed in a local food store earning about $1,500.00 monthly and currently received $750.00 monthly from [Perrin] as temporary alimony or support, giving her $2,250.00 in monthly funds to live at this time." The chancellor responded to Perrin's motion for specific findings, "The support deviation was addressed with two of the parties['] children being estranged from [Cynthia]." In fact, all three girls are estranged, having made it clear that they cast their lot with their father, the primary caregiver. Estrangement is not a basis for deviation from statutory child-support guidelines and is not an excuse for failing to pay child support. *See generally* ***Shelnut v. Dep't of Human Servs.***, 9 So. 3d 359, 364 (Miss. 2009); ***Cunliffe v. Swartzfager***, 437 So. 2d 43, 45 (Miss. 1983). Cynthia's income is comparable to that of many other noncustodial parents in Mississippi. Our courts have ordered full statutory payments from many others earning a similar income. *See* ***Gray v. Gray***, 909 So. 2d 108, 114 (Miss. Ct. App. 2005) (noncustodial parent's claim of low net income, $2,500 per month, did not prevent an $80 upward deviation); ***Lee v. Lee***, 859 So. 2d 408, 409 (Miss. Ct. App. 2003) (affirmed $65 monthly child-support order from a parent whose only income was from social-security benefits); ***Lacey v. Lacey***, 822 So. 2d 1132, 1140 (Miss. Ct. App. 2002) (affirmed child-support payment of $310 per month, which represented twenty percent of the payor's adjusted gross income). Low income is not listed among the statutory criteria for

---

[15]Copy of pay stub reveals $9.94 an hour, with forty hours worked. Forty times $9.94 equals $397.60 a week, times fifty-two weeks equals $20,675.20, divided by twelve months, equals $1,723 monthly.

overcoming the presumption in favor of the guidelines. *See* Miss. Code Ann. § 43-19-103 (Rev. 2004).

¶49.  In a similar case, this Court reversed a chancellor's order of child support when no reason was given for deviation from the statutory guidelines. *See **Clausel v. Clausel***, 714 So. 2d 265, 267 (Miss. 1998) (child support as ordered was more than three times higher than the guideline amount).  The ***Clausel*** Court stated, "If the chancellor would make more on the record findings as to why he decides an issue or fact a certain way it would greatly decrease the chances of reversal of the decision by this Court." ***Id.*** (quoting ***Dufour v. Dufour***, 631 So. 2d 192, 195 (Miss. 1994)).  Here, however, the chancellor first made no finding and then offered one without legal basis.  An example of a properly-justified deviation from statutory child-support guidelines came in ***Gray***.  *See **Gray***, 909 So. 2d at 114 (upward deviation of $80 was justified by a father's failure to take the children during his visitation periods, leading to increased expenses for the mother).

¶50.  Therefore, we reverse the chancellor's determination that Cynthia pay only $200 in monthly child support. Cynthia's child-support appeal is without merit, as it was based upon a claim of error regarding child custody.  Cynthia and Perrin now have two college-age minor children.  Perrin testified he has paid all child expenses, including providing for education and cars for the three children.  According to the statutory guidelines, Cynthia should pay twenty percent of her current adjusted gross income.  *See* Miss. Code Ann. § 43-19-101 (Rev. 2004).  We reverse on this issue, as the stated reason for deviation is legally insufficient, and remand for proceedings consistent with this opinion.

III.    **Child Custody**

31

¶51. Reversal of child-custody decisions "occurs only if a chancellor is manifestly wrong or applied an erroneous legal standard. This Court will not reverse a chancery court's factual findings, where there is substantial evidence in the record supporting these findings of fact." *Floyd v. Floyd*, 949 So. 2d 26, 28 (Miss. 2007) (internal citations omitted). "[T]he polestar consideration in child custody cases is the best interest and welfare of the child." *Albright*, 437 So. 2d at 1005. In addition to the age of the child, the other factors are as follows:

> [H]ealth, and sex of the child; a determination of the parent that has had the continuity of care prior to the separation; which has the best parenting skills and which has the willingness and capacity to provide primary child care; the employment of the parent and responsibilities of that employment; physical and mental health and age of the parents; emotional ties of parent and child; moral fitness of parents; the home, school and community record of the child; the preference of the child at the age sufficient to express a preference by law; stability of home environment and employment of each parent, and other factors relevant to the parent-child relationship.

*Id.* In the case sub judice, the court cited *Albright* and considered the applicable factors, including the best interests of the children. *Id.* at 1003.

¶52. Perrin testified that Cynthia had no relationship with her daughters for years leading up to the hearing. He never refused to allow the girls to have a relationship with their mother. He encouraged a relationship after the divorce. Perrin stated that Cynthia had not telephoned the girls in three to four years. Although all the girls were busy with extracurricular activities, Cynthia showed little interest. Brittny was involved in theater, debate, and mock-trial events. Emelie played soccer, and Erin performed in plays. Cynthia testified that she had attended none of Emelie's soccer matches, two of Erin's plays and two of Brittny's events, between 2002 and 2007. Brittny summed up her relationship with her mother by stating that she had grown "up without any kind of a mother figure that I could

32

trust and talk to." Brittny continued, "She hurt me in so many ways that I just have no need to talk to her anymore. I don't see any sense in further hurting myself or making the situation any worse, because it's real hard to believe that she could turn around all of a sudden and be a better person."

¶53. Regarding physical custody, the chancellor was persuaded by the election of the children, the disparity in the physical and emotional health of the parents, and the recommendation of the guardian ad litem, in his decision to award physical custody to Perrin. Cynthia asserts that the chancellor erred in not awarding her primary physical custody. The chancellor found that Cynthia's "parenting skills, employment responsibilities, her emotional and physical health, and stability of home environment all work against her custody at this time." The guardian ad litem recommended that custody remain with Perrin, as he had been the children's caregiver for the preceding several years. Thus, Cynthia's arguments are without merit, as substantial credible evidence supports the chancellor's decision to award physical custody to Perrin.

¶54. Regarding legal custody, the chancellor applied an erroneous legal standard, thus, his findings of fact do not support his conclusions of law. The chancellor granted joint custody, finding that Cynthia was "entitled to participate in and keep abreast of her offsprings' activities and welfare." "Joint Legal Custody" is defined by statute as meaning:

> that the parents or parties share the decision-making rights, the responsibilities and the authority relating to the health, education and welfare of a child. An award of joint legal custody obligates the parties to exchange information concerning the health, education and welfare of the minor child, and to confer with one another in the exercise of decision-making rights, responsibilities and authority.

33

Miss. Code Ann. § 93-5-24(5)(e) (Rev. 2004). The chancellor cited Cynthia's "early continuity of care prior to the separation and the willingness to care for her children and emotional ties with her children." Cynthia's continuity of care ceased minimally seven years prior to separation, according to the record before this Court. Although she may have emotional ties to the children, no substantial evidence was presented to support her "willingness to care for the children." The statute creates a presumption in favor of joint custody where the parents have agreed to it. *See* Miss. Code Ann. § 93-5-24(4) (Rev. 2004). However, these parties have not agreed to joint custody. Legal custody means more than having information about one's children; it means a sharing of "decision-making rights, the responsibilities and the authority relating to the health, education and welfare of a child." Miss. Code Ann. § 93-5-24(5)(e) (Rev. 2004). Concern for a parent's access to information does not justify granting joint legal custody, as such access is guaranteed by statute, as follows:

> Notwithstanding any other provision of law, access to records and information pertaining to a minor child, including, but not limited to, medical, dental and school records, shall not be denied to a parent because the parent is not the child's custodial parent.

Miss. Code Ann. § 93-5-24(8) (Rev. 2004). The chancellor applied an erroneous legal standard; thus, we reverse and render. We grant full legal custody of the minor children to Perrin.

## Conclusion

¶55.    The judgment of the Chancery Court of Lamar County is vacated, save for its ruling on visitation.  We reverse and render judgment regarding legal custody.  We reverse and remand for proceedings consistent with this opinion as to all other issues.

¶56.    **ON DIRECT APPEAL: AFFIRMED IN PART; REVERSED AND RENDERED IN PART; REVERSED AND REMANDED IN PART.  ON CROSS-APPEAL: AFFIRMED.**

**WALLER, C.J., CARLSON, P.J., DICKINSON, LAMAR, KITCHENS, AND CHANDLER, JJ., CONCUR.  PIERCE, J., CONCURS IN PART AND IN RESULT WITH SEPARATE WRITTEN OPINION.  GRAVES, P.J., NOT PARTICIPATING.**

**PIERCE, JUSTICE, CONCURRING IN PART AND IN RESULT:**

¶57.    I concur in part and in result with the majority's opinion. However, I write separately to express my reasoning for only concurring in part. Because I believe the majority opinion crosses into the realm of the chancery judge by finding certain facts, I concur only in part.

¶58.    I agree with the majority that we must reverse and remand on the issue of child support, as the trial court failed to detail why he deviated from the statutory guidelines. I also concur with the majority on its findings concerning child custody although for slightly different reasons. However, I concur in part and in result on the issues of alimony and property division, but I too would reverse and remand for a proper analysis by the chancellor using the **Ferguson** and **Armstrong** factors.

¶59.    A chancellor sits as a fact-finder in resolving factual disputes, and is the sole judge of the credibility of witnesses. **West v. Brewer,** 579 So. 2d 1261, 1263-64 (Miss. 1991); **Rice Researchers, Inc. v. Hiter,** 512 So. 2d 1259, 1265 (Miss. 1987); **Polk v. Polk,** 559 So. 2d 1048, 1049 (Miss. 1990). On appeal, this Court is required to follow the "substantial evidence/manifest error" standard of review. **West,** 579 So. 2d at 1264, quoting **Stallings v.**

35

*Bailey*, 558 So. 2d 858, 861 (Miss. 1990). This Court does not sit to redetermine questions of fact. *Johnson v. Black*, 469 So. 2d 88, 90 (Miss. 1985). Further, we will not disturb a chancellor's findings of fact when supported by substantial evidence unless an erroneous legal standard has been applied or is manifestly wrong. *Westbrooke v. Oglesbee*, 606 So. 2d 1142, 1145 (Miss. 1992); *Phillips v. Phillips*, 555 So. 2d 698, 701 (Miss. 1989). Finally, when substantial evidence supports the chancellor's findings, we will not disturb his conclusions, notwithstanding that we might have found otherwise as an original matter. *Jim Murphy & Assocs., Inc. v. LeBleu*, 511 So. 2d 886, 894 (Miss. 1987), *aff'd* 557 So. 2d 526 (Miss. 1990).

¶60.    This case has experienced a tumultuous ride through the judicial system. I believe the Court of Appeals erred when it affirmed the divorce in its 2005 decision while, at the same time, reversing and remanding certain issues, finding that Cynthia had been overreached, and that the property settlement was inadequate and unfair. I believe, if indeed Cynthia had been overreached, the entire judgment of divorce should have been set aside and not just portions thereof. *See Lauro v. Lauro*, 847 So. 2d 843, 849 (Miss. 2003).

¶61.    Nevertheless, I agree with the majority that physical custody was properly awarded to Perrin. I also agree that the record is lacking in adequate evidence and reasoning as to why joint legal custody was awarded. The Legislature has defined legal custody as "the decision-making rights, the responsibilities and the authority relating to the health, education and welfare of a child." Miss. Code Ann. § 93-5-24(5)(d) (Rev. 2004). Joint legal custody requires the parents to "share the decision-making rights, the responsibilities and the

authority relating to the health, education and welfare of a child." Miss. Code Ann. § 93-5-24(5)(e) (Rev. 2004). Where the chancellor awards joint legal custody, the parents are obligated "to exchange information concerning the health, education and welfare of the minor child, and to confer with one another in the exercise of decision-making rights, responsibilities and authority." *Id*.

¶62.   Where child custody is being disputed, the chancellor's findings will not be reversed unless manifestly wrong, clearly erroneous, or the proper legal standard was not applied. *Hensarling v. Hensarling*, 824 So. 2d 583, 587 (Miss. 2002). However, under the precise facts of the case *sub judice*, it is apparent that the decision of the chancellor was clearly erroneous regarding his ruling on legal custody.

¶63.   There are times when an *Albright* analysis is conducted and the findings will be split or very close between the two parties. In many cases, there are two deserving parents desiring custody of their children. Where custody is awarded to one parent between two deserving parents, it is not reversible error to award joint legal custody. However, in this matter, there is no question as to whom the *Albright* analysis favors. There is little or no reason why joint legal custody was awarded, as the children will spend most, if not all, of their time with their father. It would make little sense that a parent with little or no contact with her children could make decisions in their best interest. Therefore, Cynthia should not be vested with the "decision-making rights, the responsibilities and the authority relating to the health, education and welfare of a child." *See* Miss. Code Ann. § 93-5-24(5)(e) (Rev. 2004). I

believe it was error to award joint legal custody to both parents under the very specific facts of this case.

¶64.    As for the property division and alimony, I will not restate the facts that were detailed in the majority's lengthy opinion, nor include a detailed citation to the applicable law. When reviewing the record herein, I agree with the majority that the trial court did not accomplish a detailed *Ferguson* or *Armstrong* analysis which would afford this Court the opportunity to properly analyze this case pursuant this Court's appropriate standard of review. However, I would stop there. In my view, the majority's lengthy opinion at times determines the credibility of witnesses and impermissibly takes on the role of the fact-finder. As an appellate court dealing with a reversal of a chancellor for failure to apply a proper *Ferguson* or *Armstrong* analysis, we cannot substitute our judgment for his and therefore, must remand to the chancellor for a proper analysis.

¶65.    I would reverse this case on all property and alimony issues and remand this matter to the chancellor below for a proper *Ferguson* and *Armstrong* analysis. I would also reverse and render on the issue of legal custody, and reverse and remand on the issue of child support.